UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CHARLES A. GRAVENHORST, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 02-79-P-H |
| | ) | |
| | ) | Civil No.   07-126-P-H |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |

**ORDER ON  MOTION FOR RECONSIDERATION (Docket No. 43) AND
MOTION FOR APPOINTMENT OF COUNSEL (Docket No. 44),
AND RECCOMENDED DECISION ON THE MERITS OF
THE 28 U.S.C § 2255 MOTION (Docket Nos. 1& 23)**

A federal jury convicted Charles Gravenhorst in March 2003 of four counts of using a computer in interstate commerce to induce a minor to engage in illegal sex acts, six counts of using a computer in interstate commerce to transfer obscene matter to a minor, and one count of using an interactive computer service for carriage of obscene material in interstate commerce. Gravenhorst was sentenced to ten concurrent terms of 96 months and one concurrent term of 60 months.

Gravenhorst's 28 U.S.C. § 2255 motion contains a plethora of ineffective assistance claims challenging his representation at the pre-trial, trial, sentencing, and appeal stages of his criminal proceedings.   In support of this collateral motion Gravenhorst has filed an affidavit, signed under the penalty of perjury (Gravenhorst Aff. at 1 & 15, Doc. No. 29-3), that contains a factual narrative pertaining to his relationship with his trial level/sentencing attorney and appellate counsel.   Gravenhorst cites to this affidavit throughout his amended 28 U.S.C. § 2255 memorandum.

The United States started the ball rolling by filing a motion for summary dismissal, arguing that it is unnecessary to hold an evidentiary hearing. Gravenhorst filed a substantive reply arguing several times that an evidentiary hearing is necessary to resolve his claims. Gravenhorst's earlier requests for appointment of counsel and a hearing having been denied by the court, Gravenhorst filed a "Motion to Reconsider Evidentiary Hearing and Appointment of Counsel."  I asked the United States to respond to this motion, directing its attention to the factual averments in Gravenhorst's affidavit and the portions of the First Circuit's decisions on direct appeal noting the potential that Gravenhorst's claims of ineffective assistance of counsel may require further factual development in a 28 U.S.C. § 2255 proceeding.  See United States v. Gravenhorst, 377 F.3d 49, 52 (1st Cir. 2004), vacated and remanded, 544 U.S. 1029 (2005); United States v. Gravenhorst, No. 03-2057, 2006 WL 1813906, 1 n.1 (1st Cir. July 3, 2006); id. at 3 n.4.  Gravenhorst has replied with a memorandum, a brief supplemental affidavit executed by him, and an affidavit of Leda Gravenhorst, Charles Gravenhorst's wife.

## DISCUSSION

The First Circuit Court of Appeals provided the following summary of Gravenhorst's case:

> Gravenhorst resided in Concord, New Hampshire, from 1999 through 2002. While living in Concord, he established several email accounts under various aliases.
> In 2001 and 2002, Gravenhorst used these email accounts to proposition four females under the age of sixteen and one female who was sixteen years of age, all living in Maine, to engage in sexual conduct with him. Without repeating all of the unseemly details, Gravenhorst, forty-five years old at the time, posed as a nineteen-year-old college student named Justin Foxe and sent numerous graphic emails asking these minors for sex. In addition, Gravenhorst emailed these minors sexually-charged images, including a picture of a man and woman having intercourse and a picture of an erect penis.
> On these facts, a federal grand jury in the District of Maine presented an eleven count indictment charging Gravenhorst with four counts of attempting to

2

induce a minor to engage in unlawful sex acts, see 18 U.S.C. § 2422(b) (counts
one through four); six counts of transferring obscene matter to a minor, see 18
U.S.C. § 1470 (counts five through ten); and one count of using an interactive
computer service to carry obscene material in interstate commerce, see 18 U.S.C.
§ 1462 (count eleven). After a two-day trial, a petit jury convicted Gravenhorst on
all counts.

Gravenhorst, 377 F.3d at 50 -51.  The "one female who was sixteen years of age" is referred to

herein as "Hedi K."[1] and her name comes up quite a bit in the following discussion.  This is

because Gravenhorst believes evidence of his interactions with Hedi K. should not have been

admitted at trial (at least not in a trial on all eleven counts) or considered during sentencing

because his conduct with respect to Hedi K. was not part of his charged offenses.

A.      **Ineffective Assistance Standard**

The First Circuit summarizes the standard for analyzing ineffective assistance claims

arising the context of a federal prosecution as follows:

> "The essence of an ineffective-assistance claim is that counsel's
> unprofessional errors so upset the adversarial balance between defense and
> prosecution that the trial was rendered unfair and the verdict rendered suspect."
> Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). In order to prevail, a
> defendant must show both that counsel's representation fell below an objective
> standard of reasonableness and that there exists a reasonable probability that, but
> for counsel's unprofessional errors, the result of the proceeding would have been
> different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In other
> words, a defendant must demonstrate both seriously-deficient performance on the
> part of his counsel and prejudice resulting therefrom. …
> Although the Supreme Court in Strickland discussed the performance
> prong of an ineffectiveness claim before the prejudice prong, the Court made
> clear that "there is no reason for a court deciding an ineffective assistance claim to
> approach the inquiry in the same order or even to address both components of the
> inquiry if the defendant makes an insufficient showing on one." Id. at 697. As the
> Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of
> lack of sufficient prejudice, which we expect will often be so, that course should
> be followed." Id.
> ….

---

[1]     In its second decision on appeal the First Circuit inadvertently spells her name as "Heidi."

3

We are mindful that, in evaluating the prejudice suffered by a defendant as a result of his counsel's alleged deficient performance, we must consider the "totality of the evidence before the judge or jury." <u>Id.</u> A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Id.</u> at 696; <u>see</u> <u>also</u> <u>Buehl v. Vaughn</u>, 166 F.3d 163, 172 (3d Cir.1999) (noting that "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied"); <u>Reed v. Norris</u>, 195 F.3d 1004, 1006 (8th Cir.1999) (finding it impossible for the defendant to establish prejudice where the evidence of his guilt was overwhelming); <u>Bieghler v. McBride</u>, 389 F.3d 701, 707 (7th Cir.2004) (finding no prejudice where overwhelming evidence pointed to the defendant's guilt).

<u>United States v. De La Cruz</u>, 514 F.3d 121, 140-41 (1st Cir. 2008).

It is worth stressing two tenants of ineffective assistance review with regards to this kitchen sink 28 U.S.C. § 2255 motion.  First: "Under the first prong of <u>Strickland</u>, there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of reasonable professional assistance,' and courts should avoid second-guessing counsel's performance with the use of hindsight."  <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006) (quoting <u>Strickland</u>, 466 U.S. at 689).  And, second, "counsel was under no obligation to raise meritless claims.  Failure to do so does not constitute ineffective assistance of counsel." <u>Acha v. United States</u>, 910 F.2d 28, 32 (1st Cir. 1990) (citations omitted).

4

## B.  Gravenhorst's Ineffective Assistance Claims[2]

### Pretrial and Trial Representation

### 1.  Failure to challenge the indictment

In his first ground attacking his trial counsel's performance, Gravenhorst faults counsel for not making a timely objection to his indictment, in whole or in part.  Gravenhorst's challenge has not only to do with the letter of the indictment document but also to do with the grand jury process leading to his indictment.   He believes that there was substantial evidence that the indictment was partially based on the perjured testimony of Hedi K. and that the government did not reveal this defect to the grand jury.  (Am. Sec. 2255 Mot. at 8; Am. Sec. 2255 Mem. at 3.) He points to the testimony of Robyn W., the Government's own complaining witness, who indicated that Hedi K. had lied to her when she said that Gravenhorst's visit was uninvited and who revealed that she had discovered by accessing Hedi K.'s email account that Hedi K. willingly gave her address and phone number to Gravenhorst (and others). (Am. Sec. 2255 Mem. at 3 n.2.)  Gravenhorst thinks it would be incredible for the Government to believe, in making its presentation to the grand jury, that he would have arranged to drive 100 miles to Hedi's residence, arriving there when she would have been at school, had Hedi not provided him with the contact information for the encounter.  In setting forth this ground, Gravenhorst segues into

---

[2]    Gravenhorst has some general discontents with which he frames his ineffective assistance of challenge claims prior to delineating them.  He asserts that the prosecution "presented no evidence of any solicitation by the accused to engage in [sexual] activity at a **particular time** and a **particular place**.  The accused never traveled to meet, never arranged to meet, and never agreed to meet any of the women named in Counts 1-4." (Am. Sec. 2255 Mot. at 2.)  Gravenhorst indicates that the Government did present evidence, over an objection, of his encounter with Hedi K., who was "of lawful age" at the time.  (Id. at 2 n.4.) He points out that the defense elicited testimony from an acquaintance of Hedi K.'s who learned that Hedi K. had admitted that she had invited Gravenhorst, A.K.A. Justin, to meet her, providing him with her telephone number and address. (Id.) He also believes that the prosecution had to do more than produce the images as grounds for Counts 5-11 obscenity to demonstrate that they appealed to prurient interests or were patently offensive.  (Id. at 3.)   He faults defense counsel for not putting on any direct evidence to counter the Government's case, leaving Gravenhorst only with the closing argument that the prosecution's evidence was unreliable and insufficient.  (Id. at 4,6.) These preliminary observations are redundant of Gravenhorst's arguments vis-a-vis his delineated grounds.

an argument that there was insufficient evidence for the Government to achieve an indictment on a theory that he attempted statutory rape; he thinks that the prosecution had to present evidence that he actually committed statutory rape.  (Id at 3-4.)  "The accused," Gravenhorst opines, "never met, never traveled to meet, never arranged to meet, and never agreed to meet, either Melissa D., Kelly D., Robyn W., or Sara F."  (Id. at 5.)  "Particularizing the conduct alleged by the generic term 'sexual activity,' in Counts 1-4, would have alerted the grand jury to the patent unchargeability of consummated[3] conduct, ensured a just verdict, and protected the defendant from the practice that allowed the government to cloak a fallacy in bare formality."  (Id. at 7.)  Finally, he faults counsel for not objecting to the indictment as it pertains to Counts 5-11, on the grounds that the charged material was not subject to prosecution as a matter of law. (Id. at 8.)

In his 28 U.S.C. § 2255 reply memorandum, Gravenhorst dedicates a great deal of attention to this ground, dividing his points into subsections: the perjury of Hedi K., the Government's knowledge of the tainted testimony, the Government's attempts to mislead the grand jury, the lack of evidence in support of completed conduct, the indictment on its face misled the grand jury, the grand jury may not have been properly instructed on the question of attempted conduct; there was a lack of evidence to support completed conduct; there was a failure to allege specific sexual activity, and the materials charged in Counts 5 through 11 were not chargeable as obscenity.  (Sec. 2255 Reply Me. at 3-9.)

Counts 1 through 4 of the indictment alleged that Gravenhorst used a computer in interstate commerce in an attempt to induce a minor to engage in sex acts, in violation of 18 U.S.C. § 2422(b). (Indictment, Doc. No. 1.)  Each count lists a separate 14- or 15-year-old victim, and charges that Gravenhorst:

---

[3]     It seems most likely that Gravenhorst means unconsummated conduct here.

> using a facility or means of interstate commerce, specifically a computer by way
> of the Internet, knowingly induced and enticed, and attempted to induce and
> entice, the victim identified below, an individual who had not attained the age of
> 18 years, to engage in sexual activity for which the defendant could be charged
> with a criminal offense, namely sexual abuse of a minor who had not attained the
> age of 16 years, in violation of 17-A M.[R.S.]A. § 254(1)(a) . . . .

(Id.)  The victims listed were identified only as "Victim-1," age 14; "Victim-2,", age 15;

"Victim-3," age 15; and "Victim-4," age 15.  (Id.)  The dates alleged were February to December

2001 (Count One), August 2001 to March 2002 (Count Two), January 12, 2002, to January 22,

2002, (Count Three), and December 2001 to February 2002 (Count Four).  (Id.)  Counts Five

through Ten alleged that Gravenhorst:

> using a facility and means of interstate commerce, to wit, a computer by way of
> the [I]nternet, knowingly transferred and attempted to transfer obscene matter,
> namely ".jpg" image files bearing the filenames identified . . .to the victim
> identified . . . an individual who had not attained the age of 16 years, knowing that
> such other individual has not attained the age of 16 years . . . .

(Id.)  The three named victims were Kelly D., Robyn W., and Sara F., all age 15.  (Id.)  The

counts identified the ".jpg" image files as "aaronanderica" and "justinHard4u."  (Id.)  These

counts bore the dates of August 2001 (Count Five), March 2002 (Count Six) January 12-22,

2002 (Counts Seven & Eight), and December 2001 to February 2002 (Counts Nine & Ten). (Id.)

Count Eleven charged that between January 9, 2002, and January 20, 2002, Gravenhorst:

> knowingly used an interactive computer service, for carriage in interstate
> commerce over the Internet obscene, lewd, lascivious and filthy pictures and
> writings to Victim-5; namely: ".jpg" image files bearing the filenames
> "aaronanderica" and "justinHard4u"; and America Online instant messages in
> which the defendant stated that he wanted [to] lick ... Victim-5's pussy and that he
> wanted Victim-5 to touch his dick. . . .

(Id.)

7

The United States responds to this ground by arguing that Gravenhorst has made no showing that Hedi K.'s testimony included perjury.  (Gov't Resp. Mem. at 6-7.)   The United States Supreme Court explained in <u>United States v. Dunnigan</u>:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621.  A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.

507 U.S. 87, 94 (1993) (citations omitted).  With regards to other grounds, Gravenhorst cites to Robyn W.'s testimony that Hedi provided Gravenhorst with contact information.[4]  However, even if Hedi K. willfully misrepresented this to the Grand Jury it is not a material matter to the charges in the indictment.   As the United States points out, Gravenhorst's claim that Hedi K. lied with regards to the question of whether or not she did or did not share contact information with him in order to facilitate their meeting.  (Gov't Resp. Mem. at 7.)  Indeed, the answer to this question is collateral to her key material testimony, that is whether or not "Gravenhorst drove to Hedi's home, kissed her neck, dropped his pants, and rubbed her vagina with his hands."  (<u>Id.</u>) Especially at this early stage of his representation of Gravenhorst, counsel had no reason to challenge Hedi K.'s version of events on the grounds that it was perjury.

With regards to the aspect of this ground that relates to proof that he actually completed statutory rape and his assertion that the indictment ought to have been more particular about attempt, the First Circuit rejected Gravenhorst's straight-up challenge in addressing Gravenhorst's second appeal.  It explained:

> We have also considered Gravenhorst's two pro se arguments challenging the indictment as it pertains to the § 2422(b) violations. First, Gravenhorst claims

---

[4]     See discussion at Numbers 7 and 16 below.

8

> that the indictment charges a "non-offense" because it does not allege that he
> engaged in a completed sex act or received consent from one of the young women
> to have sex. We reject this argument. The indictment sets forth the elements of the
> offense, including the allegation that Gravenhorst used the internet to induce an
> underage person to engage in illegal sexual activity. This is all that is required.
> See United States v. Yefsky, 994 F.2d 885, 893 (1st Cir.1993). There is also no
> merit to Gravenhorst's argument that the indictment did not adequately charge
> attempt under § 2422(b). The lesser included offense of attempt need not be
> included in the indictment where the indictment adequately pleads the substantive
> offense. See United States v. Feinberg, 89 F.3d 333, 339 (7th Cir.1996).

Gravenhorst, 2006 WL 1813906, at *1 n.2. This passage does not, in and of itself, resolve

Gravenhorst's ineffective assistance claim because the First Circuit was not addressing counsel's

performance on this score. However, in my view counsel cannot be said to have performed

below the Strickland standard by not raising claims so easily dismissed in a footnote by the First

Circuit. See Mahone v. United States, Civ. No. 07-148-B-W, 2008 WL 504012, 5 & n. 3 (D.

Me. Feb. 20, 2008) (recommended decision) ("In my view, "if the First Circuit has denied ...

relief on direct appeal because of a lack of merit on a substantive claim," which it did here, "such

a determination does sway this court's Strickland performance and prejudice analysis if the

movant's claim is that counsel performed deficiently apropos that legal issue." Brooks v. United

States, Civ. No. 07-115-P-S, 2007 WL 4180540, *1 (D. Me. 2007) (recommended decision).").

2. **Failure to move to sever**

In his second ground criticizing his trial counsel's performance Gravenhorst argues that

counsel should have made two arguments for severance. First, he believes that he should have

moved to sever Count 11 (eleven)-- use of an interactive computer service to carry obscene

matter --from the rest of the counts because this count was the only count vis-à-vis which the

prosecution could have presented the un-charged Hedi K. evidence. (Am. Sec. 2255 Mem. at 8-

9.) Gravenhorst also addresses this claim in his 28 U.S.C. § 2255 reply memorandum insisting:

"Evidence relevant to Count 11 was not independently admissible in Counts 1-10; evidence relevant to Count 11 was inflammatory; and, finally, evidence in Count 11 risked prejudicial spillover." (Sec. 2255 Reply Mem. at 9.)  "Because Count 11 involved only allegations of obscene material sent to an individual <u>not</u> under the age of 16" Gravenhorst maintains, "the irrelevant and inflamatory allegations involving an encounter with Hedi K. could only serve to unfairly prejudice the defendant on the remaining counts." (<u>Id.</u> at 10.)

Second, Gravenhorst believes that counsel should have attempted to convince the Court to sever Counts 1 through 4 from Counts 5 through 11. (<u>Id.</u> at 8-9.)  Gravenhorst contends that the evidence of inducement apropos Counts 1 through 4 was irrelevant to the offenses charged in Counts 5 through 11.  (<u>Id.</u> at 9.)  In his reply memorandum he explains, "evidence in Counts 1-4, of unlawful sexual activity, would have no relevance to allegations in Counts 5-11 that material, sent to individuals over the internet, was obscene."  (Sec. 2255 Reply Mem. at 10.)

The United States responds that "all of the charged offenses were perpetrated during the same period of time, all involved sexually based conduct aimed at underage girls in Maine, and all involved the use of Gravenhorst's computer." (Gov't Resp. Mem. at 9.)

<u>United States v. Boulanger</u> explained:

> Joinder is proper if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed.R.Crim.P. 8(a). We have construed this rule generously in favor of joinder. [<u>United States v.</u>] Meléndez, 301 F.3d [27,] 35 [(1st Cir. 2002)]. Further, " '[s]imilar' does not mean 'identical,' and we assess similarity in terms of how the government saw its case at the time of indictment." <u>Id.</u> (citing <u>United States v. Edgar</u>, 82 F.3d 499, 503 (1st Cir.1996)). "In determining whether counts are properly joined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." <u>United States v. Taylor</u>, 54 F.3d 967, 973 (1st Cir.1995).

10

444 F.3d 76, 87 (1st Cir. 2006).

Gravenhorst's case for severance, the case he thinks counsel should have made to this Court, is weak. It is more a matter that if he had his druthers he would have sliced and diced the proceedings against him to give him the best advantage.   I recognize that Gravenhorst, relying on United States v. Jordan, 112 F.3d 14, 16 (1st Cir. 1997), insists in his reply memorandum (in response to the United States' argument that he never indicated he would like to have testified as to one severed count alone) that he was confronted with and pressured into a decision not to testify because of his exposure on the other ten counts, whereas if he had a discreet exposure on Count 11 he could have taken the stand to refute the contested Count 11 allegations.   (Sec. 2255 Reply Mem. at 10.)

The flaw in Gravenhorst's reasoning here is that, as discussed further below, the Court allowed the admission of the Hedi K. testimony without limitation after argument on this issue by both sides.  This was the Court's decision, irrespective of whether or not the Government may have limited its argument on the relevance in its closing.  I cannot see on this record why this Court would have seriously entertained a motion to sever under Boulanger had counsel pursued such a motion.

### 3.  **Failure to preserve *Lawrence v. Texas, 539 U.S 558 (2003)* claim**

Gravenhorst's third reproach of counsel is that his attorney should have preserved an objection to his exposure to obscenity charges by relying on the pending Supreme Court case, Lawrence v. Texas, 539 U.S. 558 (2003). (Am. Sec. 2255 Mem. at 10-12.)  Lawrence was decided June 26, 2003. The Gravenhorst verdict was delivered March 25, 2003. Gravenhorst insists:  "Failure to preserve objection[] that federal obscenity law may be unconstitutional[]

subjected the Petitioner to prejudicial, albeit erroneous, 'plain error' review on appeal."  (Id. at

10.)

        On this Lawrence-predicated theory, the First Circuit ruled:

> Gravenhorst argues that the Supreme Court's decision striking down an anti-sodomy law under the due process clause in Lawrence renders obscenity laws unconstitutional. He contends that Lawrence made unconstitutional any law that mandates a society's own moral code. This argument was not raised below, and therefore we review only for plain error. It suffices to say that other circuits have concluded that obscenity laws survive Lawrence, see United States v. Coil, 442 F.3d 912, 915-16 (5th Cir.2006); United States v. Extreme Assocs., 431 F.3d 150, 155-59 (3d Cir.2005) and that no court has reached a contrary conclusion. Therefore, the statutes are not plainly unconstitutional.

Gravenhorst, 2006 WL 1813906 at 2. [5]

        In his 28 U.S.C. § 2255 reply memorandum, Gravenhorst recognizes that the First Circuit

Court of Appeals addressed this claim but argues that he was not afforded a meaningful review

because of the failures of trial (and appellate) counsel to convincingly argue that the rational of

Bowers v. Hardwick, 478 U.S. 186 (1986) was under "direct attack." (Sec. 2255 Reply Mem. at

11.)  "Had counsels below not performed deficiently," Gravenhorst believes, he "would have

been afforded a fair hearing on this matter."  (Id. at 12.)

        If the First Circuit has concluded that the statutes under which Gravenhorst was

prosecuted are not "plainly unconstitutional" in the aftermath of Lawrence then trial counsel did

not perform below the Strickland performance standard in not raising this challenge before

Lawrence - a split decision - was even decided. See Mahone, 2008 WL 504012 at 5 & n. 3.

---

[5]     Gravenhorst's attorney did argue that the images at issue were not obscene, although he did not cite the Lawrence issue.  (March 24, 2003, Trial Tr. at 227.)

4. **Failure to move to exclude evidence seized outside the scope of the warrant**

"The search warrant," Gravenhorst maintains in his fourth 28 U.S.C. § 2255 ground, "did not provide for seizure of either (a) a "chronology" compiled by the Petitioner at the instruction of his then-counsel, James Gleason, or (b) file names of alleged sexually-oriented websites; neither did federal prosecutors independently secure warrant authorization in the instant case." (Am. Sec. 2255 Mem. at 12-13.)  "Counsel's failure to timely challenge the seizure," Gravenhorst believes, "prejudiced the Petitioner on critical matters relating to intent and the accused's state of mind."  (Id. at 13.)

The search warrant includes the following delineation of property and articles to be searched:

1. Any computer records or electronic data that pertains to email or America Online instant messages, or any other screen names or identities related to Charles Gravenhorst, sent or received under his accounts.
2. Any computer or electronic data containing visual images displaying or depicting male genitalia and/or sexual activities involving male and females, as associated with this report and described in this report by Hedi Knight.
3. Any computer or electronic data containing or resembling the visual image that is provided by Hedi Knight, which she received as an instant message from the screen name agraf603 as an attached photo to the instant message, and is attached to the Affidavit and incorporated into the Affidavit as Search Warrant Affidavit Addendum #1.

(Search Warrant, Doc. No. 23-4.)  Gravenhorst has not attached the referenced search warrant affidavit.

In his reply memorandum Gravenhorst complains that the "Government once again rests on the void authority of the now vacated judgment of the First Circuit on direct appeal." (Sec. 2255 Reply Mem. at 12.)  Gravenhorst targets the seizure of the chronology he prepared at the behest of his previous attorney which was protected by attorney-client privilege. (Id. at 12-13.) He believes an evidentiary hearing is necessary on the question of whether previous counsel

13

directed him to compose the chronology because the Government concedes that there is

insufficient record evidence to establish this claim.  (<u>Id.</u> at 13.)

> With regards to the chronology, the Government explains:
>
>> During the execution of a search warrant, a Customs agent discovered the following file on Gravenhorst's computer hard drive, labeled as "chronology":
>>
>>> Monday, February 25th, receive first call from Donnelly to speak with Justin. Give name Andrew Graf and b-date 1-14-57, said work with Charles Gravenhorst, address 16 Thompson.
>>>
>>> Thursday, February 28, detective from Maine arrive[d] at fro[nt] door, c. 10:45 a.m., with one Concord PD plain clothes, ask[ed] to speak at Concord PD, arrange to speak at 1:00 p.m.
>>
>> (T. 156-57; GX 95). When the prosecutor offered the "chronology" in evidence, Ruffner replied, "No objection" (T. 156).

(Gov't Resp. Mem. at 13.) [6]  "Arguably," the Government observes, "the 'chronology' found on

Gravenhorst's computer established that he was misleading the authorities and keeping track of

his efforts to do so." (<u>Id.</u>) The United States points out that the search was predicated in part on

evidence that Gravenhorst had set up an AOL account in the name of Adam Graf with a post

office box in Concord, the chronology contained the name Andrew Graf, and, therefore, the

seizure was within the authorized scope of the warrant.  (<u>Id.</u> at 14.)

The question is whether there were tenable grounds to move to suppress this information

on the grounds of attorney client privilege. The United States points out that nothing in the

record shows that this chronology was a communication to anyone but himself, much less to an

attorney.  (<u>Id.</u> at 14-15.)  It also argues that even if Gravenhorst's attorney had pressed the issue

the argument would revolve around Federal Rule of Evidence 801(d)(2) admissibility.  (<u>Id.</u> at

---

[6]     I rely on the Government's presentation of the content of the chronology because Gravenhorst has not provided any information about its content.

15.)  Gravenhorst did raise this precise argument for exclusion in his pro se brief for his first

direct appeal.  (Gov't Ex. 1, Doc. No. 28-2, at 10,16.)  The First Circuit made a determination

that this argument was meritless.  Gravenhorst, 377 F.3d at 51 n.1.  Counsel understandably did

not make a mountain out of this molehill.

Gravenhorst's second challenge to the search is that the warrant did not permit the

"search of all computer data," but only that sent or received under his email account or America

Online instant message accounts.  (Sec. 2255 Reply Mem. at 13.)  "The Government,"

Gravenhorst maintains, "should not have been permitted by the court to suggest guilt by

association merely on the basis that the site names resembled evidence of wrongdoing."  (Id.)

As the United States points out, the search warrant clearly identified Gravenhorst's

Macintosh computer as "the place to be searched."  (Gov't Resp. at 16.)  "Moreover,"

> the warrant permitted the seizure of "computer records or electronic data . . . or
> any other screen names or identities related to Charles Gravenhorst ." In answer to
> a question about "web sites that had been visited on that computer using the
> defendant's screen name," Customs Agent Marx testified that he was able to
> determine that Gravenhorst's computer had visited websites named
> "hotteenagegirls2002," "Youngpicsvidsandpasses, "Amat-teen, "Beautifulteens,"
> "Underage club," "Hardcore Lolita pics," "Cyber-lolita," "Little sexy nymphets,"
> "Underage-list," and "perfectteenpics" (T. 162). Certainly Agent Marx was
> lawfully checking the computer when he observed evidence of Gravenhorst's
> frequent use of sexually oriented websites involving underage girls. A plain view
> seizure is lawful if (1) the seizing officer has a prior justification for being in a
> position to see the item in plain view and (2) the evidentiary value of the item is
> immediately apparent. See Horton v. California, 496 U.S. 128, 136 (1990). Even
> if Ruffner should have challenged the evidence under a "scope of the warrant"
> theory, there was no prejudice because other properly seized and introduced
> evidence overwhelmingly established Gravenhorst's commission of the crimes
> charged. Again, Ruffner's failure could not have undermined confidence in the
> outcome of the trial.

(Id.)  I agree with the United States' assessment of this claim.

15

5.  **Failure to move for a bill of particulars**

Gravenhorst presses a fifth challenge to trial counsel's performance in which he argues

that counsel should have sought a bill of particulars from the Government specifying the sexual

activity underlying Counts 1 though 4; the conduct that constituted a "substantial step," proof of

which was necessary to establish a crime under those counts; and when and where the induced or

solicited sexual conduct took or was to take place.  (Am. Sec. 2255 Mem. at 13.)

> Identifying the omitted particulars was essential to avoid the very 'Kafka-esque' character the Government's charges reflected.  The accused could only guess what conduct may have constituted the "sexual activity" induced;  could only guess what actions drew him near enough to such conduct with persons he never met, never traveled to meet, never arranged to meet, never agreed to meet, as to form a 'substantial step'; and had no basis to inter from the Indictment or discovery that he ever extended such invitation to the complainants in Counts 1-4 to engage in the charged unlawful conduct at a <u>particular</u> <u>place</u> and <u>time</u> so as to establish a discernable solicitation toward attempt.

(Sec. 2255 Reply Mem. at 14.)

"A bill of particulars serves three purposes" the First Circuit explains in <u>United States v.</u>

<u>Hallock</u>:

>  to give the accused details concerning the charges against him, enabling him to prepare a defense; to prevent double jeopardy; and to avoid surprise at trial. <u>United States v. Leach</u>, 427 F.2d 1107, 1110 (1st Cir.), cert. denied, 400 U.S. 829 (1970). Whether to grant a bill of particulars is left to the sound discretion of the district judge, <u>Will v. United States</u>, 389 U.S. 90, 98-99 (1967), whose decision will be reversed only for abuse of discretion. <u>United States v. Paiva</u>, 892 F.2d 148 (1st Cir.1989) (citing <u>Wong Tai v. United States</u>, 273 U.S. 77, 82 (1927)). To establish an abuse of discretion, "a defendant must demonstrate actual surprise at trial or actual prejudice to his substantial rights." <u>Paiva</u>, 892 F.2d at 154.

941 F.2d 36, 40 (1st Cir. 1991).

It is not insignificant for purposes of addressing this 28 U.S.C. § 2255 ineffective

assistance claim, that the decision whether or not to grant a defense request for a bill of

particulars is reviewable under an abuse of discretion standard.  After all, this Court presided

16

over Gravenhorst's pre-trial and trial proceedings and can exercise its judgment as to whether or not it would have entertained such a request or how it would have reviewed a magistrate's determination on the question under Federal Rule of Criminal Procedure 59. See United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) ("Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing.")  Gravenhorst's discontent is not that he did not know the names of the victims in the indictment.  The indictment also set forth the time periods of the conduct charged. Rather, Gravenhorst is reviving his argument that he was not subject to these charges because he never really set up a time and place to meet the under-aged victims. However, as discussed above, the First Circuit has already ruled that there was sufficient grounds to pursue Gravenhorst for attempt under Counts 1 through 4.  Counsel's efforts to seek a bill of particulars would have accomplished nothing on this issue.

6.  **Failure to seek remedy for the misconduct of Detective Todd Donnelly**[7]

Gravenhorst further complains about his trial attorney in arguing that he should have challenged a decision by a Government investigator to prohibit a defense investigator, Scott Philbrick from interviewing Hedi K. "to obtain an independent account and assessment of her disputed allegations."  (Am. Sec. 2255 Mem. at 13-14.)  Gravenhorst believes that his attorney should have pursued sanctions for this misconduct and should have attempted to interview Hedi K. himself.  (Id. at 14.)  He described Donnelly's conduct as intimidating.  (Sec. 2255 Reply

---

[7]     Gravenhorst's sixth ground, "f," is, per Gravenhorst's own explanation, redundant of previous grounds. His argument is also so skeletal it does not warrant a separate discussion.  (See Am. Sec. 2255 Mem. at 13; Sec. 2255 Reply Mem. at 14.)

Mem. at 15.)  This ground is really redundant of the ground identified as Number 21 below and that discussion fully addresses this claim.

7. **Failure to secure exculpatory emails**

Gravenhorst faults his attorney for not seeking discovery of certain emails described by Robyn W. which "would have provided conclusive proof of Hedi K.'s prevarications sufficient to undermine her admissibility either before the grand jury or at trial." (Am. Sec. 2255 Mem. at 14.) He insists that if the emails had been obtained  "Hedi K.'s allegations would have been indisputably shown to be tainted and inadmissible."  (Sec. 2255 Reply Mem. at 15.)   The problem with this assertion by Gravenhorst vis-à-vis his burden of demonstrating meaningful prejudice per <u>Strickland</u> is that the evidence that the Robyn W. emails would have provided in fact came into the trial when Robyn W. testified.  Robyn confirmed that Hedi told her about Gravenhorst's visit to Hedi's home.  (Mar. 23, 2003, Trial Tr. at 122.) Hedi told Robyn that she had never given Gravenhorst her address and that she had no idea how he had found her.  (<u>Id.</u> at 123-24)  Robyn testified, however, that she discovered an electronic mail message from Hedi to Gravenhorst, then posing as Justin Foxe, which included Hedi's address and telephone number. (<u>Id.</u> at 125-26.)  According to Robyn, Hedi later admitted sending the message which contained her address and telephone number. (<u>Id.</u> at 126). Confirmed by a forensic examination of her computer, Robyn testified that she later received an instant message from Gravenhorst, still posing as Justin Foxe, in which he wrote that he had found Hedi by looking up her address on a map. (<u>Id.</u> at 123-24.)

8. **Representation of qualifications**

Gravenhorst maintains in his eighth complaint about his trial attorney that there came a point early on in the criminal proceedings in which he began to lose confidence in his attorney to

18

handle his case and he expressly pressed his attorney to demonstrate his qualifications "in similar

federal matters." (Am. Sec. 2255 Mem. at 14.) According to Gravenhorst: "Counsel flatly

misrepresented his experience in trial proceedings in federal court." (Id. at 14-15.) In support of

this ground Gravenhorst cites to his entire fifteen-page affidavit. (Doc. No. 23-3.) His affidavit

contains the following relevant representation:

> I was temporarily appointed counsel in the United States District Court for the
> District of New Hampshire(Concord): a man, as best I can recall, by the name of
> Paul Shorn, Esq., who impressed upon me at this very preliminary stage that I
> should be sure to see to it that I am represented by counsel who "knows what
> they're doing," because the federal jurisdiction was a more demanding "league"
> than State. It was in this context that I inquired of attorney Ruffner regarding his
> experience.
>      …Mindful of the counsel I had received that first day in New Hampshire
> from Attorney Shorn, I pressed the young Mr. Ruffner as to his experience in like
> matters as that which I faced. I asked specifically if he had federal trial
> experience, and particularly, I asked, "Are you in over your head on this one, are
> you up to this?" He could only say, "I can handle it." It was later a great shock to
> me when, on March 25, 2003, at a break in the trial proceedings, the trial judge
> summoned Ruffner off to the side (we were both approached; I could not tell if he
> were beckoning to him or to me), and there announced to him that he was
> presenting him with a commemorative gift in recognition of his first trial before
> the court.

(Gravenhorst Aff. at 1-2.) In his reply memorandum Gravenhorst states only that the

Government failed to provide any defense to this claim. (Sec. 2255 Reply Mem. at 15.)

As this Court well knows, the commemorative gift presented to Gravenhorst's attorney

reflected his participation in a trial before a particular judge in the District of Maine. This is not,

standing alone, evidence of counsel's lack of experience as a criminal defense attorney. Indeed a

computer search of this court's CM/ECF system reveals that Gravenhorst's attorney's name

appears as counsel of record in least twenty-three cases prior to August 12, 2002, the date

petitioner's case was filed, and then he appeared as attorney of record in an additional seventeen

cases prior to July 21, 2003, the date Gravenhorst's case was closed. The docket data reflects

that defense counsel had an active federal criminal practice during the relevant time period.

Additionally, counsel's prior experience is not the touchstone which guides the Strickland

inquiry in any event.  This court can make its own assessment of whether or not counsel was "in

over his head."

### 9.  **Erroneous advice on sentencing exposure**

Gravenhorst asserts that his attorney informed him that a conviction carried a potential

sentence of 41 to 51 months and it was on this advice that he elected to proceed to trial only to

later discover that his guideline range was 87 to 108 months. (Am. Sec. 2255 Mem. at 15;

Gravenhorst Aff. at 1-2 & n.2.)   This advice "misled the Petitioner, preventing him from

making a properly informed decision eschewing plea negotiations and proceeding to trial." (Am.

Sec. 2255 Mem. at 15.) While the Government insists that Gravenhorst never represented he

would have done anything but go to trial (Gov't Resp. Mem. at 37-38),[8] in his supplemental

affidavit Gravenhorst clarifies:

> [A]s to the advice of Robert Ruffner on day one: that is, at arraignment on the
> federal charges.  His assessment was clear: conviction at trial "risked"
> imprisonment of from 41 to 51 months.  It is hard enough to summon the resolve
> to face the great resources of the United States of America aligned against you
> even when you believe you are in the right.  This is not an uncommon sentiment
> among Americans.  The "risk" of at least three and one-half years in jail was
> formid[a]ble enough.  Had Robert Ruffner clearly stated that the proper Guideline
> Range would involve imprisonment of up to 108 months, I would not have elected
> to contest the charges at trial.  I even made these sentiments clear to Mr. Ruffner,
> that a plea was not out of the question under certain circumstances where I could
> contest the legal sufficiency of the charges.  Mr. Ruffner never advised me that I
> could enter any kind of "nolo" plea, or even preserve my appellate rights by
> pleading to the Indictment.
>      Mr. Ruffner did "float" one proposal: if I might for[]go trial if an
> agreement could be reached to plead to one count, Count 11, with a potential
> sentence of 24 months.  I made it clear to him that the difference between 24

---

[8]      The Government also flippantly adds: "In any event, the alleged erroneous sentencing prediction did not 'undermine confidence in the outcome' of either the trial or the sentence. Strickland, 466 U.S. at 694.  Lacking prejudice the claim fails."  (Id. at 38.)

months with <u>no</u> appellate options and at least 41 months with <u>all</u> options was a difference without persuasive distinction.

      Counsel Ruffner never subsequently presented any actual offer of agreement and, under the circumstances established by his counsel on sentencing risk, nothing was ever presented to alter the resolve formed on day one to vigorously pursue trial.  Had the truth been presented, this would not have been the case.

      In reviewing the many notes I have collected since that time, I find that I have record that Ruffner provided written amendment to his initial evaluation of sentencing risk to 46 to 57 months; still vastly underestimating the actual maximum guideline calculation of 108 months.  I have no copy of this written amendment.

(Supp. Gravenhorst Aff. at 1-2, Doc. No. 53-3; <u>see</u> <u>also</u> Sec. 2255 Reply Mem. at 15.)

With respect to Gravenhorst's notion that he might have entered a nolo plea and preserved his appellate rights, it is clear after Gravenhorst's two direct appeals that there was no merit to such an approach.  Furthermore, Gravenhorst concedes that his attorney 'floated' the possibility of pleading guilty to Count 11 with an exposure of 24-months with a waiver of a right to appeal and Gravenhorst rejected this proposition because he preferred to face a possibility of 41 months to preserve the right to appeal. Nowhere in this record is there any indication that the United States proposed a favorable plea agreement that Gravenhorst would have accepted.  In view of the PSI the most that could have been achieved by pleading guilty is a reduction for acceptance of responsibility.   What remedy does Gravenhorst anticipate would come to him if he were to prevail on this ground ?   It seems the court could reinstate his right to plead guilty to the charges, but the outcome of this case in unlikely to change in that event.  This very quandary may explain the dismissive tone of the Government's response.

     10.  **Failure to object to magistrate judge presiding over <u>voir</u> <u>dire</u>**

In his tenth claim against trial counsel Gravenhorst complains that the court conducted no colloquy to inform him of his right to have an Article III judge preside over <u>voir</u> <u>dire</u> and did

not obtain Gravenhorst's express, knowing consent.  (Am. Sec. 2255 Mem. at 15.) Gravenhorst

cites to the Supreme Court's decision to review United States v. Gonzales, 483 F.3d 390 (5th Cir.

2007). The Supreme Court majority concluded: "[A]cceptance of a magistrate judge at the jury

selection phase is a tactical decision that is well suited for the attorney's own decision. … [W]e

conclude that express consent by counsel suffices to permit a magistrate judge to preside over

jury selection in a felony trial, pursuant to the authorization in § 636(b)(3)." Gonzalez v. United

States, __ U.S. __, __, 128 S. Ct. 1765, 1770 -71 (May 12, 2008).

      In his affidavit Gravenhorst represents that when they got to the jury selection

proceeding, he,

> had already been directed by counsel to consent to the Magistrate at this stage,
> which I objected to.  I was told we "had to" do this.  Though having no specific
> knowledge on this matter of law, I was incredulous that this could be.  I was then
> instructed, "We have to, to secure rulings in our favor later."

(Gravenhorst Aff. at 7.)  In his reply memorandum Gravenhorst seems to argue that (even if

there is Supreme Court precedent against him) the absence of First Circuit precedent on point

entitles him to relief.  (Sec. 2255 Reply Mem. at 16.)

      Per Gravenhorst's own description of the interactions he had with his attorney pertaining

to the question of a magistrate judge presiding over his jury selection, his attorney made a

tactical decision to proceed in this fashion, an attorney-guided strategic choice condoned by

Gonzalez.   Other than asserting his bald assertion of a right to have an Article III judge preside

over his jury selection, Gravenhorst has not identified anything in the jury selection procedure

over which the Magistrate Judge presided that prejudiced him; he makes no assertion that the

Magistrate Judge somehow contributed to the "improperly constituted" jury.

### 11. **Failure to object to improperly constituted jury**

In a related challenge to the above, Gravenhorst faults his attorney for not objecting to "the government's discriminatory use of preemptory challenges to exclude individuals of the accused's own sex." (Am. Sec. 2255 Mem. at 16.) He states that the panel was comprised of eleven women "which panel was facially disparate to the community cross-section; vastly underrepresented individuals of the accused's own sex; and constituted a panel likely to be unfairly hostile to a 45-yr. old defendant accused of sexual offenses against young women." (Am. Sec. 2255 Mot. at 10.) Again, Gravenhorst cites to his own affidavit in its totality. The relevant passage seems to be where he indicates that "when conducting jury selection, no coherent approach to that proceeding had been prepared." (Gravenhorst Aff. at 7.) He further opines: "At jury selection, Ruffner repeatedly would turn to me and ask <u>my</u> counsel on selection strategy: 'What do you think about them?' I barely knew where I was, having just recovered from retinal detachment surgery, and he was asking <u>me</u> what to do." (<u>Id.</u>)

The United States, in responding to this claim, notes that "individuals with the first names of Thomas, Harold and John sat on the jury." (Gov't Resp. Mem. at 20 n.8.) It also notes that Gravenhorst has indicated that the jury composition was a consequence of his attorney's "'own actions'" and that, therefore, it is fair to conclude that it was "a matter of defense strategy." (<u>Id.</u> at 21.)

In his reply memorandum Gravenhorst counters the Government's response to this claim:

> [The] Government misrepresents [the] factual claim of Petitioner that 12-member jury panel comprised 11 women; Petitioner claims that 11 women were present in the composition of the jury <u>and</u> <u>alternates</u>, i.e., 14 members. Nonetheless, [the] Government appears to argue that allegations of a 400% disparity is mitigated by existence of only a 300% disparity. Either way, the facial disparity according to sex is a plainly inaccurate representation of the community cross-section.

23

(Sec. 2255 Reply. Mem. at 16.)  Gravenhorst flatly rejects the proposition that counsel made a legitimate trial strategy decision apropos this concern.  (<u>Id.</u>)

   "'No one is entitled automatically to be tried by a jury of persons comprised of his or her own race, religion or gender."  <u>In re United States</u>, 426 F.3d 1, 9 (1st Cir. 2005) (citing <u>Taylor v. Louisiana</u>, 419 U.S. 522, 538 (1975) and <u>Barber v. Ponte</u>, 772 F.2d 982, 997 (1st Cir.1985)). Beyond citing to raw numbers and speculating that women would be more judgmental of him than men, Gravenhorst has provided no basis by which to conclude that his attorney had grounds to argue that the underrepresentation of males on his panel was "due to systematic exclusion of the group in the jury-selection process."  <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979).

   12.  **Failure to move for dismissal of the indictment on speedy trial grounds**

   As for Gravenhorst's twelfth complaint with his trial attorney's performance, Gravenhorst maintains that his attorney was inattentive to a 70-day speedy trial time lapse and, thus, did not move for dismissal on that ground.  (Am. Sec. 2255 Mem. at 16.)

   The record belies Gravenhorst's contention of his attorney's demonstrated negligence on this score.  On August 30, 2002, he filed a motion for enlargement of time that indicated:

>       Charles Gravenhorst was indicted on August 6, 2002.  He was arraigned on August 16, 2002 and the Court entered a standard Discovery Order requiring counsel to confer on discovery with[]in the 5 days and setting a motion deadline of August 30, 2002.  The Government has provided lengthy discovery in this matter which is similar to the discovery provided in a related State of Maine charge.  Defense Counsel did not ask for more than the 14 days given by the Court because it anticipated that it would be enough time.  However, due to the complexity of these charges, their interrelationship with the State charges, and the press of other matters Defense counsel has not been able to fully evaluate the propriety of any pretrial motions.  In addition, a death occurred in Defense counsel's family on September 29, 2002 requiring him to attend a funeral in New York on September 30, 2002.
> ….

> Charles Gravenhorst is aware of his rights under the Speedy Trial Act, 18 U.S.C. § 3161 and voluntarily waives those time limits and asks that the court exclude from the speedy trial calculations the entire time period of the extension sought.

(Crim. No. 02-79-P-H, Docket No. 7.)  That motion was granted.  (Id., Doc. No. 8.)

On September 13, 2002, defense counsel filed another motion for an extension of time.

It further indicated:

> Defense counsel has received one 14 day extension of the deadline to file motions which is now September 13, 2002.  On September 9, 2002, Defense Counsel and [the] Assistant U.S. Attorney were engaged in lengthy discussions regarding the case and discovery.  In that discussion it became clear that "victim-4" was not covered in the discovery provided up to that point. [The Assistant U.S. Attorney] provided some limited identifying information to Defense counsel with regards to "victim-4" but no reports or statements (if any exist) dealing with "victim-4" have been provided.
> On September 11, 2002 [the Assistant U.S. Attorney] contacted defense counsel and indicate[d] in a message that there was a "matrix of computer information" between Defendant and the victims that forensics was putting together.  [The Assistant U.S. Attorney] indicated that he would provide the additional computer information as soon as he received it.  On September 13, 2002 [the Assistant U.S. Attorney] indicated that, in addition to the required discovery, he would make additional investigative reports and witness statements available for my review.
> Defense counsel has reviewed the material provided to date and takes the position that additional discovery is needed to identify any pretrial motions which may be appropriate or to prepare an adequate defense in this case. However, the additional information which the government has already agreed to provide may remedy some or all of the current inadequacies.  Defense counsel believes that it would be in Defendant's best interest and an efficient use of Court resources to extend the deadline for filing motions until full discovery has been provided by the Government.
> …
> Charles Gravenhorst is aware of his rights under the Speedy Trial Act, 18 U.S.C. § 3161 and voluntarily waives those time limits and asks that the court exclude from the speedy trial calculations the entire time period of the extension sought.

(Id., Doc. No. 9.)  The Court granted the request for an enlargement of time and exclusion until

September 27, 2002. (Id., Doc. No. 10.)  Defense counsel then moved for a continuance of trial

and a further exclusion of the extension time of the speedy trial period, representing that Gravenhorst voluntarily waived his attendant rights.  (<u>Id.</u>, Doc. No. 12.) That request was granted.  (<u>Id.</u> Doc. No. 13.)

After a trial date was set for January 30, 2003, defense counsel filed a motion on January 14, 2003,  for a continuance of trial and a Speedy Trial Act waiver, seeking a March 3, 2003, jury selection date.  (<u>Id.</u> at 19.)  This motion explained that Gravenhorst had suffered a retinal tear in one eye and a retinal detachment in another, both of which required surgery and two weeks of bed rest with no reading. (<u>Id.</u> at 1.)  The motion also represented that the case involved numerous documents that were still being provided from the Government and that Gravenhorst may not be able to read these documents by the January 30, 2003, trial date.  (<u>Id.</u>)  Again, counsel represented that Gravenhorst was aware of his rights under the Speedy Trial Act and voluntarily waived those time limits, asking that the court exclude from the speedy trial calculations, beginning from the date of the motion.  (<u>Id.</u> at 1-2.)  This Court granted that motion. (<u>Id.</u>, Doc. No. 20.)  Prior to trial defense counsel moved to exclude evidence of other bad acts on the grounds of unfair prejudice in three motions <u>in</u> <u>limine</u>.  (Doc. Nos. 21, 22, & 23.)

In his reply memorandum Gravenhorst faults the Government's calculation that only 47 days elapsed on the Speedy trial clock prior to the jury selection, arguing that the Court "entered an unjustified lengthy recess before testimony began."  (Sec. 2255 Reply Mem. at 17.)  "Because no motions were filed from March 3, 2003, until March 14, 2003,"  Gravenhorst reasons, "the prolonged recess taken after jury selection does not toll the clock.  Hence, 10 days were not excludable." (<u>Id.</u>)  Gravenhorst further faults the court's formal "ends-of-justice" determinations of exclusion based on defense counsel's earlier motions.  (<u>Id.</u> at 17-19.)

26

This record speaks for itself. It is clear from the foregoing that there are no grounds for an ineffective assistance claim on speedy trial grounds.  Gravenhorst is grasping at straws.

13. **Failure to contact and interview critical defense witnesses**

In his thirteenth ineffective assistance ground targeting trial counsel performance, Gravenhorst identifies the following seven matters pertaining to the contacting and interviewing of  potential defense witnesses:

- Scott Philbrick could have testified that Hedi K. had consented to an interview that might have revealed discrepancies in the Government's case but was prohibited from doing so from Detective Donnelly.  (This complaint has already been made in Ground 6.);
- Attorney James Gleason, who represented Gravenhorst prior to Attorney Ruffner, could have testified that the (time-line) 'product' found on Gravenhorst's computer was protected by attorney-client work-product privilege and that Detective Donnelly called him regarding Scott Philbrick's efforts to interview Hedi K. and threatened Gleason;
- Anne Toresdahl, the adult guardian of Hedi K., could have testified that Hedi K. was not unwilling or would not have been traumatized by an interview by Philbrick and that it was Donnelly that would not let the interview transpire;
- Christa Fournier, who Gravenhorst describes as a friend of Hedi K. and Melissa D., could have testified that she witnessed the pair bragging about how they had got Gravenhorst put in jail;
- The defense should have interviewed Laura F., Hedi K.'s cousin, who was an eyewitness to the January 23, 2002, events and who officers described as an inconsistent witness;
- Defense counsel could have interviewed classmates and associates of Hedi K. based on Robyn W.'s statements towards establishing that Hedi K. was a repeat liar who persistently gave her phone number and address to guys she met online, going so far as soliciting gifts from these fellows;
- And, finally, Gravenhorst asserts a catch-all complaint with regards to his attorney's efforts to interview the above identified witnesses and to utilize their potential testimony.

(Am. Sec. 2255 Mem. at 17-18.)   In his reply memorandum Gravenhorst maintains in a conclusory paragraph that counsel's decisions regarding investigation did not constitute a valid strategic decision. (Sec. 2255 Reply Mem. at 19.)

Looking at the entire state of the evidence presented at trial, the potential testimony envisioned by Gravenhorst would not have so shifted the tenor of the prosecution's case to such an extent that the decision not to pursue the testimony could be deemed ineffective.

>The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated, see [United States v.] Porter, 924 F.2d [395,] 397 [(1st Cir. 1991)], or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused, see, e.g., United States v. Tajeddini, 945 F.2d 458, 466 (1st Cir.1991) ("to call as a witness a person other than Parvin to testify to Parvin's health might emphasize Parvin's absence and suggest that Parvin's testimony would have been adverse to petitioner"), cert. denied, 505 U.S. 1211(1992).

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993).  Much of the testimony specified by

Gravenhorst is redundant of evidence that did come in either through direct or cross examination.

This was not a case in which the prosecution's case can be characterized as "less than

compelling," Lema, 987 F.2d at 54, but it is a case in which the substance of the testimony of

these purposed witnesses either came in at trial, see United States v. Ritch, 583 F.2d 1179, 1183 -

84 & n.1 (1st Cir. 1978), or as to which there was some danger to the defense in presenting the

questionable, undermining testimony to the jury.

14. **Failure to raise a timely objection to the jury instructions**

Gravenhorst goes on to maintain that trial counsel performed ineffectively when he did

not make a bevy of objections to this Court's proposed instructions.

The First Circuit addressed Gravenhorst's challenge to this Court's instructions on direct

appeal as follows:

>Gravenhorst argues that the district court erroneously instructed the jury on the definition of obscenity for counts five through eleven. See 18 U.S.C. § 1470; 18 U.S.C. § 1462. Because Gravenhorst did not object to the instruction, we consider the claim only for plain error. See United States v. Colon Osorio, 360 F.3d 48, 52 (1st Cir.2004) (stating the elements of the plain error standard). The challenged instruction provided:
>>Material is obscene when one, the average person applying contemporary community standards would find that the material taken as a whole is in some way erotic and appeals to a degrading, unhealthy or morbid interest in sex, as distinguished from normal healthy desires.

Two, the average person applying contemporary community standards would find that the material depicts or describes ultimate sex acts, masturbation, or lewd exhibition of the genitals in a patently offensive way.

And, three, a reasonable person would find that the material taken as a whole, lacks serious artistic, political, or scientific value.

Gravenhorst contends that this instruction incorrectly equated eroticism with obscenity and thus permitted a conviction for transferring merely "erotic" (i.e., non-obscene material). We believe it was not plain error to include the term "erotic" in the instruction. The relevant instruction used the conjunctive to explain that obscene material had to be both "erotic" and "appealing to a degrading, unhealthy or morbid interest in sex." The district court's use of "erotic" in this manner appears consistent with the Supreme Court's use of the term in <u>Cohen v. California</u>, 403 U.S. 15 (1971). In <u>Cohen</u>, the Supreme Court considered a defendant's challenge to his conviction for wearing a jacket stating, "Fuck the Draft." <u>Id.</u> at 16. The Court held that this language was not obscene. In so holding, it noted that "[w]hatever else may be necessary ... to prohibit obscene expression, such expression must be, in some significant way, erotic." <u>Id.</u> at 20. The Court went on to conclude that a vulgar allusion to the draft would not cause sexual stimulation and therefore could not be erotic. <u>See id.</u> Thus, under <u>Cohen</u>, for language to be obscene, the fact finder must determine that the allegedly obscene language had some sexual connotation. The obscenity claims derive from Gravenhorst's choice of language and the sexually-charged images that he sent in the relevant emails. A jury instruction on obscenity should track the principles articulated by the Supreme Court in <u>Miller v. California</u>, 413 U.S. 15, 24 (1973) (stating that for material to be obscene the work must appeal to the prurient interest, describe sexual conduct in a patently offensive way, and lack serious literary, artistic, or scientific value). In this case an instruction mirroring the Maine obscenity statute, which itself tracks <u>Miller</u>, would have sufficed. <u>See</u> 17 M.R.S.A. § 2911. Regardless, it certainly was not <u>plain</u> error for the district court also to incorporate <u>Cohen</u>'s use of erotic in the instruction. <u>See</u> <u>United States v. Patel</u>, 370 F.3d 108, 118 (1st Cir.2004).

<u>Gravenhorst</u>, 377 F.3d at 51 -52 (footnotes omitted).  The First Circuit added the following two

footnotes:

At oral argument, Gravenhorst's counsel suggested that, because the district court used "erotic" at the outset of the obscenity definition, the jury likely focused on this term to the exclusion of the rest of the instruction. In making this argument, counsel overlooked that the court provided the jurors with written copies of the instructions, thereby giving them a clear opportunity to appreciate the instruction's compound nature.

29

> To the extent that the word "erotic" in modern usage can denote material that while prurient is nonetheless not legally obscene, an instruction might simply emphasize, as the district court did here, that the material must as a whole appeal to a degrading, unhealthy or morbid interest in sex, but without making specific reference to the term "erotic."

Id. at 51 n.2, 52 n.3.

On Gravenhorst's second appeal, the First Circuit revisited the instructions in the following footnote:

> Gravenhorst also raises two challenges to the jury instructions concerning the substantive § 2422(b) charges. He claims that the court should have instructed that a substantive violation of § 2422(b) requires proof of a completed sexual act or an agreement to engage in sexual activity. Neither objection was raised below, and we therefore review for plain error. See United States v. Medina-Martinez, 396 F.3d 1, 8 (1st Cir.2005). Since § 2422(b) criminalizes attempts, a substantive violation clearly does not require a completed sexual act.

Gravenhorst, 2006 WL 1813906, at *2 n.3.

In his 28 U.S.C. § 2255 memorandum Gravenhorst argues that his attorney should have advanced the following instructions: a limiting instruction pertaining to the testimony of Hedi K.; an instruction that defined decency vis-à-vis a national community standard; an instruction that required a completed sex act for purposes of conviction on Counts 1 to 4; an instruction that defined the scienter element of Counts 1 through 4 to include knowledge that the conduct was unlawful under Maine law; and an instruction that all counts were to be separately and independently adjudged and not determined on the basis of accumulated evidence otherwise relevant to other counts.  (Am. Sec. 2255 Mot. at 11-12; Am. Sec. 2255 Mem. at 18-21; Sec. 2255 Reply. Mem. at 19-20.)

Gravenhorst spends the most attention on his first claim regarding the testimony of Hedi K.  (Am. Sec. 2255 Me. at 18-20.)    He points out that the Court offered to entertain a limiting instruction at the time it addressed Gravenhorst's motion in limine. (See Mar. 24, 2003,

30

Sentencing Tr. at 42.)  Counsel renewed his argument that the testimony should not be admitted at all.  (Id. at 43.)  The Court explained:

> Just so the record is clear for any reviewing court, this is a witness as to whom the government has not charged in the indictment, but her testimony is being offered and objection is being raised, and I previously ruled …and  I now renew the ruling under 404, this can be offered on the issue of motive, intent, plan, etc., things of that sort because its probative value does outweigh any prejudice as analyzed under Rule 403.
>
> So that ruling having been made, the question remains, do you want any kind of limiting instruction?

(Id. at 44-43.)  Defense counsel responded that Gravenhorst declined to have the instruction immediately, and indicated that he would inform the court when he wanted it.  (Id. at 44.) Gravenhorst represents that counsel decided not to request the instruction later in fear of putting too much emphasis on the testimony.  (Am. Sec. 2255 Mem. at 19.)  He feels that the lack of an instruction "left the jury to wonder what proper bearing such testimony had on the <u>charged</u> offenses."  (Id.)  Gravenhorst repeats this claim in a separate ground, "s" without adding any more substance.  (Id. at 23; <u>see</u> <u>also</u> Sec. 2255 Reply Mem. at 22.)

In view of the First Circuit's earlier review of this Court's instructions, the only meaningful issue raised by Gravenhorst apropos the instructions and counsel's performance is the issue of the passing on the court's invitation for a limiting instruction.[9]  At the beginning of

---

[9]    Gravenhorst does raise, also for the first time by cloaking it as an ineffective assistance claim, the issue of whether the instructions prompted the jury to make an independent determination as to each count. The United States adequately counters this argument:

> Contrary to Gravenhorst's suggestion, the Court instructed the jury that it was the Government's burden "to prove each of the elements of the crimes charged beyond a reasonable doubt," and that Gravenhorst had "the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential element of <u>an</u> offense charged" (emphasis added) (T. 236). Moreover, the Court told the jury that "[b]efore you may convict [the defendant], the government's evidence must satisfy you beyond a reasonable doubt of his guilt <u>of the particular offense charged</u>" (emphasis added) (T. 236). Consequently, the jury must have understood that it was to consider each charge separately. The record refutes Gravenhorst's assertion that the jury was not told to consider the charges separately, and Ruffner need not have

31

the second day of trial the Court revisited the question of a curative instruction apropos Hedi K.'s

testimony.  The following exchange took place:

> THE COURT:  [A]s we discussed at the charge conference, I had indicated I
> would be prepared to give a curative instruction if requested, and I think with
> respect to the 404(b) issue, and you told me on the off record charge conference
> that you wanted no such instruction.  Will you reiterate that for the record?
> MR. RUFFNER:        That's correct, Your Honor.  I believe that my opinion that
> the curative instruction does more to highlight the testimony than it does to cure
> or limit the jury's actual use of the evidence.

Mar. 25, 2003, Trial Tr. at 232.)  Thus, this decision was not a negligent omission by defense

counsel but a calculated strategic choice easy to understand given the totality of the evidence that

came in the previous day of trial.  See Strickland, 466 U.S. at 689; Knight, 447 F.3d at 15.

### 15.  Impeding Gravenhorst's right to testify

In his fifteenth reproach of trial counsel Gravenhorst maintains that his attorney's actions

"directly and effectively barred the Petitioner from testifying."  (Am. Sec. 2255 Mem. at 22.)  He

explains that he clearly apprised his attorney of his intent to testify, relating that he was not

guilty of the crimes charged, that he never intended to engage in sexual activity with any

underage individuals, that Hedi K.'s allegations were false, that the images predicating Counts 5

through 11 were received from sources other than Gravenhorst, and that the complainants had

misrepresented their ages to him.  (Id.)  He further maintains that his attorney failed to interview

him until the weekend before trial and when he did his attorney expressly refused to allow

Gravenhorst to testify and refused to advise him on how to comport himself on direct or cross

examination.  (Id. at 21-22.)  He references his affidavit in which Gravenhorst represents:

---

objected to the jury charge on this basis. See Acha [v. United States], 910 F.2d [28,] 32 [(1st Cir.
1990)] (failing to raise a meritless argument is not ineffective assistance of counsel).
(Gov't Resp. Mem. at 34-35.)

[I]t was not until the week prior to trial that I was able to get Ruffner to interview me about the events relating to the charges.  I was most concerned about what to expect when testifying, how to prepare myself mentally, having never been in a similar situation.

We met on a Saturday in the conference room at the office of Vincent, Kant & Ruffner, with assistant, and recent law school graduate, Tracey Ledbetter, in attendance. Ruffner's demeanor towards me was not supportive, but combative. I was totally at a loss at this approach.  This was doing nothing to help me gather my thoughts for trial or understand how he would direct me through my account. I became completely defeated by his approach, unsupportive conduct, and unwillingness to conduct any preparation to examine me to testify on my behalf when he finally said, "You are not testifying; you have a right to testify (he laughed), but you are not testifying. [The Assistant U.S. Attorney] would send me Christmas cards for the next ten years if I let you testify.  You are not testifying." I gave up.  I relented.
…
After the government's presentation, I was incredulous when counsel stood up and, after presenting no evidence and calling no witnesses, stated, "The defense rests."  The trial judge, noting the absence of my testimony, took the opportunity to examine me on that point.  He asked if I would be testifying and that I should consult counsel.  After having been ridiculed and intimidated by counsel into dispensing with my resolve to testify, having been provided no preparation for examination, counsel then, unbelievably, turned quietly to me and asked, "Are you testifying?"  WAS I TESTIFYING? This, the same counsel who flatly instructed me, I was "not testifying."  I had nothing to say.  I had no idea if I would then be subjected to an utterly unprepared, counter-productive examination by an unwilling counsel, and so dimly responded I would waive my right.

(Gravenhorst Aff. at 6-7, 8-9.)

In his reply memorandum Gravenhorst stresses:

It was the actions of counsel prior to trial that had made any pretense of testifying a charade, for counsel had already withdrawn his willingness to support any decision to proceed with testimony, thereby effectively abandoning his client; and, in so doing, devoted no attention to his responsibility to assure that his client's right to testify was protected by thoroughly advising him of all relevant implications, as well as the choice, ultimately, being his alone.

(Sec. 2255 Reply Mem. at 20-21.)  He further maintains that he clearly expressed to counsel his desire to testify, particularly apropos the falsehoods of Hedi K.  (Id. at 21.)

33

The trial transcript paints a different picture of Gravenhorst's decision not to testify. After the Court denied the defense motion for judgment of acquittal, the Court inquired of Gravenhorst personally (Mar. 24, 2003, Trial Tr. at 227.)   Addressing Gravenhorst on his right to testify, the Court told him: "Mr. Gravenhorst, I want to be sure you understand your constitutional rights at this point.  You have the right to testify, constitutional right to testify, and you have the constitutional right not to testify." (Id. at 227-28.)  The Court told Gravenhorst that he should consult with his attorney about what choice was in his best interest.  (Id. at 228.)  "And you should listen to him carefully in terms of his advice," the Court explained, "but ultimately, it's your decision to make, not his.  You should listen to his advice, but you have to make the decision." (Id. at  229.)  The Court then proceeded with meticulous care:

> I am going to ask you two questions, I'm going to ask you whether you've had adequate opportunity to talk with your lawyer about this.  And then if your answer is yes, without telling me what his advice was, I'm going to ask you what your decision is.
> Have you had the opportunity to discuss this with your lawyer adequately?

(Id.)  Gravenhorst replied, "Yes, I certainly have."  (Id.)  Asked if he wished to testify or not, Gravenhorst responded: "My decision is to retain my right against being a witness against myself and to not be a witness."  (Id.)  After the Court queried counsel if it were true that he would not be putting on a direct case, counsel indicated that this was the state of the matter.  (Id.) The United States points out that the defense did not rest without presenting evidence until the next morning and that apparently Gravenhorst had the entire evening to think about it, obviating an inference of counsel's coercion, see cf. Lema, 987 F.2d at 53 (finding that a defendant's reluctant agreement with his lawyer's advice not to testify does not amount to coercion).

While the Court can always revisit its determination apropos the willingness of Gravenhorst to forego his opportunity to testify, I view his representations in this collateral challenge to be back-filling in the hopes of obtaining further collateral review.

16. **Failure to adequately challenge Hedi K.'s testimony**

Repeating his discontents about the admission of Hedi K.'s testimony, Gravenhorst believes that his attorney did not mount an adequate challenge to its admissibility.  He contends that <u>United States v. Frankhauser</u>, 80 F.3d 641, 648-49 (1st Cir. 1996) is clear First Circuit law that there is an absolute bar against 'other wrongs' evidence that is not supported by sufficient evidence that the other wrong was actually committed.  (Am. Sec 2255 Mem. at 22.) He further faults counsel for not citing <u>United States v. Varoudakis</u>, 233 F.3d 113, 118 (1st Cir. 2000 ) to the Court for the proposition that while Hedi K.'s testimony might have special relevance it was inadmissible because it included "bad character or propensity as a necessary link in the inferential chain."  (Am. Sec. 2255 Mem. at 22-23.)  Finally, Gravenhorst opines that counsel should have made a Rule 404(b) argument that motive was not relevant to or required for conviction.  (<u>Id.</u> at 23.) (<u>See</u> <u>also</u> Sec. 2255 Reply Mem. at 21.)

In its second <u>Gravenhorst</u>  opinion the First Circuit addressed Gravenhorst's challenge to the Court's admission of Hedi K.'s testimony as follows:

> Gravenhorst contends that the district court abused its discretion by permitting evidence that he had visited one of the women to whom he sent sexually explicit images, Heidi K., and attempted to have sexual relations with her. Heidi K. was 16 years old at the time that Gravenhorst visited her, and therefore she was of legal age to have sexual intercourse under Maine law. Since intercourse with Heidi K. would not have been a crime under § 2422(b), Gravenhorst claims that this evidence was irrelevant and should have been excluded.
> The district court concluded that this "other wrongful act" evidence was admissible because it showed Gravenhorst's intent in sending sexually explicit images to young women to convince them to have sexual relations with him. We

35

review this ruling for an abuse of discretion. See United States v. Landrau-Lopez, 444 F.3d 19, 23 (1st Cir.2006).

       Federal Rule of Evidence 404(b) permits admission of evidence of other wrongful conduct to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." For evidence to be admissible under Rule 404(b), the evidence must have some special relevance other than the defendant's propensity to commit a crime and must meet the standards set forth [in] Federal Rule of Evidence 404(b). See United States v. Decicco, 370 F.3d 206, 211 (1st Cir.2004).

       The district court acted within its discretion by admitting this evidence. Gravenhorst sent the same explicit messages to Heidi K. as he did to the other women. That Gravenhorst acted upon his email propositions to Heidi K. was evidence of his intent in sending emails to the other women. See Landrau-Lopez, 444 F.3d at 24 ("The other bad act need not be identical to the crime charged so long as it is sufficiently similar to allow a juror to draw a reasonable inference probative of ... intent."). Thus, the evidence had "special relevance" under Rule 404(b).

       We also do not find an abuse of discretion in the district court's Rule 403 determination. While this evidence may have harmed Gravenhorst's case, it did not do so unfairly. See United States v. Candelaria-Silva, 162 F.3d 698, 705 (1st Cir.1998). The evidence was important in establishing Gravenhorst's motive for sending email messages to young women-an essential element of the charged offense.

Gravenhorst, 2006 WL 1813906 at *2.

       In short, counsel did mount a significant challenge to the admission of Hedi K.'s testimony, this Court ruled against the defense, and the First Circuit concluded that the evidentiary ruling was soundly within the court's discretion.  With regards to the Strickland performance prong, counsel tried to persuade the Court not to admit this evidence, was unsuccessful and there is no basis to fault defense counsel.  Citing two additional cases would not have changed the minds of either the District Court judge or the appellate judges.

     17. **Failure to inform the court of improper jury contact**

       In his seventeenth ground Gravenhorst states: "Personal contact between the jury foreperson and the Petitioner and counsel was improper and undermined reasonable certitude of the jury's integrity." (Am. Sec. 2255 Mem. at 23.)  "Counsel," he complains, "failed to bring this

matter to the court's attention or to move, accordingly, for mistrial."  (Id.)   Gravenhorst cites to

his affidavit which indicates, as relevant:

> On the morning of the first day of trial, Ruffner and I were standing
> together at the court's entrance checkpoint, waiting to be cleared through.  I
> mentioned to him about allegations of Hedi K. being something a jury ought not
> to believe, and other passing matters relating to the upcoming proceedings, and
> was cautioned to speak more quietly.  There was a woman standing immediately
> beside me in line.  She briefly made eye contact, but I paid no attention and put
> the matter out of mind.
> ….
> After entering the courtroom, the jury filed in.  Judge Hornby appointed a
> woman to serve as jury foreperson. I immediately noted that she was, in fact, the
> woman who had been standing immediately beside me at the checkpoint earlier,
> while Ruffner and I had been conversing on matters related to trial.  I distinctly
> recall bringing her to his attention, because I specifically remember I mentioned
> that, dressed in a braless, skin-tight "spandex"'-like top, she didn't seem to me to
> be dressed appropriately, especially under the circumstances.  Ruffner took no
> notice.

(Gravenhorst Aff. at 8.) "Counsel's failure to request examination of the juror in question,"

Gravenhorst asserts, "leaves the court with no basis of certainty as to what this juror overheard

and what impact such contact may have had."  (Sec. 2255 Reply Mem. at 22.)  He elaborates:

> It is noted that the entire jury were already at risk of undue influence because of
> prolonged recess between jury selection and the formal commencement of trial
> and that the district court conducted no examination on the first day of trial to
> assure that the jury had no improper exposure during the intervening period.  In
> addition, the remarkable brevity of its deliberations, in cumulative consideration
> with the above, as well as its disparate composition, calls into question the entire
> panel's integrity.

(Id.)

Gravenhorst's own factual presentation indicates that, with regards to the performance

prong of Strickland, counsel attempted to prevent Gravenhorst from opining about his case while

moving through the checkpoint.  The attire worn by the juror would be no basis for asking the

court to consider her appropriateness as a juror/foreperson.  And, as argued by the United States

(Gov't Resp. Mem. at 22), the comments overheard would not be detrimental to the defense, as the remarks would only cast doubt on the reliability of Hedi K.'s testimony and, therefore, the prejudice ran to the prosecution's case and not that of the defense.

    18.  **Failure to consult or present expert testimony**

    Gravenhorst maintains that his attorney should have utilized expert testimony on "the matter of 'community standards' in prosecutions for obscenity."  (Am. Sec. 2255 Mem. at 23.) He relies on the following paragraph from the First Circuit's <u>United States v. Palladino</u>:

> While in our earlier opinion, we said that we would require expert testimony on each element of obscenity, and while at least one member of the court strongly believes that experts on national standards may on occasion be of crucial importance, we are unable to say, in light of <u>Paris Adult Theatre I v. Slaton</u>, 413 U.S. 49, 56 n. 6 (1973), that experts are required on this issue. Of course we adhere to the position, not affected by <u>Paris Adult</u>, that experts are permitted. <u>United States v. One Reel of Film</u>, 481 F.2d 206, 209 n. 3 (1st Cir. 1973).

490 F.2d 499, 503 (1st. Cir. 1974).  In his reply memorandum Gravenhorst adds that counsel did not even consult relevant information or an expert to prepare for trial on this issue.  (Sec. 2255 Reply Mem. at 23.)

    Reviewing the trial transcript as a whole, counsel seems to have made a strategic choice early to not press the issue of community standards.  See <u>Strickland</u>, 466 U.S. at 689; <u>Knight</u>, 447 F.3d at 15.  Foisting an expert on a jury on a visceral inquiry such as this can certainly backfire, and, as <u>Palladino</u> makes clear, the reliance on an expert is discretionary.  Gravenhorst has certainly not explained how this is a case in which an expert on the national standard was of "crucial importance."

19.  **Failure to object to irrelevant testimony**

In his nineteenth discontent with trial counsel Gravenhorst argues that testimony elicited by the Government that he was married and the father of two young children was not relevant to the charges against him and inflamed the jury.  (Am. Sec. 2255 Mem. at 24.)   In his reply memorandum Gravenhorst responds to the Government's argument that allowing the testimony about other potential users of the internet in the household could have been favorable to the defense by stating:  "Any probative value would have been markedly outweighed by the risk of prejudice presented by injecting the solely inflammatory insinuation that the accused was an adulterer and an immoral parent.  Further, at <u>no</u> time did the accused offer in defense that individuals other than he had access to the computer and the accounts in question…"  (Sec. 2255 Reply Mem. at 23.)

Gravenhorst cites to <u>United States v. Lawrence</u>, 189 F.3d 838 (9th Cir. 1999) in support of this argument; that decision, while perhaps in the same universe as the challenge raised by Gravenhorst, it is not in the same galaxy.[10]  The evidence remarked on by the prosecutor in

---

[10]     The Ninth Circuit addressed the following issue in the following manner in  <u>Lawrence</u>:

Bill Lawrence was an Anchorage attorney and businessman, involved with numerous ventures in Alaska and throughout the northwestern United States. He declared bankruptcy in January 1991….[T]he superseding information charged Lawrence with three counts: (1) mail fraud, in violation of 18 U.S.C. § 1341 ("count one"); (2) false-statements bankruptcy fraud, in violation of 18 U.S.C. § 152(3) ("count two"); and (3) concealment-of-assets bankruptcy fraud, in violation of 18 U.S.C. § 152(1) ( "count three").

Lawrence was married to Jody Watkins, a Delta Airlines flight attendant. Their union was one of convenience-she gained tax benefits, and he got to fly for free on her airline as well as receive estate planning benefits. The couple lived apart, rarely saw one another, and dated other people.

Throughout the trial, the Government elicited testimony, over Lawrence's objections, which emphasized the unconventional nature of his relationship with Watkins. Lawrence's failure to disclose his married status to other women with whom he was romantically involved was addressed in the Government's closing argument. The Government referred to this as "the big lie," asking the jury whether they could "think of a worse lie offhand. How many worse lies or more cruelty than letting a woman think that you are available to her to become involved in her life when in fact you're married to a woman that you rarely see for other reasons? That's a pretty significant lie." Lawrence also objected to the Government's admission of testimony concerning

closing was material to Gravenhorst's landlord's identification of Gravenhorst as the resident of

the apartment in question, as opposed to a nonfictional Justin Foxe or Andrew Graf.   Counsel

did not perform ineffectively by not making such an objection that may well have befuddled the

jury in terms of why the information was objectionable to the defense.

### 20.  **Failure to object to the Government's closing statements**

Gravenhorst's twentieth claim against his trial attorney is that he failed to object to four

aspects of the prosecutor's closing argument. (Am. Sec. 2255 Mem. at 24-27.)  First, Gravenhorst

argues that the prosecutor knew that he had never engaged in sexual activity in any way with the

four individuals identified in Counts 1 through 4, but that in the closing statements the prosecutor

stated, "'you <u>know</u> that he [the defendant] induced … Melissa D[.]. Kelly D[.], Robyn W[.], and

Sara F[.], all whom were under 16, to engage in sexual intercourse or oral sex with him.'"  (Am.

Sec. 2255 Mem. at 24; <u>see also</u> Sec. 2255 Reply Mem. at 23.)  The cited passage of the transcript

actually reads:  "You know that he induced <u>and attempted to induce</u> Melissa D[.]. Kelly D[.],

---

Lawrence's planned lifestyle following bankruptcy, as well as his access to large amounts of
money within three months of bankruptcy. These objections were overruled.
      On May 24, 1995, the jury returned general guilty verdicts on counts one and two; it was
unable to reach a verdict on count three….
      Prior to the second jury trial on counts two and three, Lawrence made a motion <u>in limine</u>
seeking to prevent the Government from introducing evidence of his personal lifestyle. The district
court held that while evidence of Lawrence's marriage was relevant as it related to property
matters-"assets, liabilities, transfers of assets, things like that"-evidence concerning witnesses'
knowledge of Lawrence's marital status and the circumstances surrounding it "sounds like [the
Government was] throwing a little dirt in" and is not "a fair shot." With respect to the evidence
regarding Lawrence's post-bankruptcy financial status, the court held that the "availability of cash
subsequent to the bankruptcy is relevant ... what he was doing with money and property following
the bankruptcy is relevant."
      ….
      The testimony elicited by the Government regarding Lawrence's marriage and the
circumstances of that relationship was not probative of Lawrence's guilt or innocence of the
crimes with which he was charged. Any relevance this testimony may have had is easily
outweighed by the unfair prejudicial effect it had on the jury's ability to focus on the issues
relevant to the charges. See United States v. Hitt, 981 F.2d 422, 424 (9th Cir.1992) ("Where the
evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's
even a modest likelihood of unfair prejudice or a small risk of misleading the jury."). Accordingly,
the district court abused its discretion in allowing this testimony to be heard by the jury.
189 F.3d at 841-43.

Robyn W[.], and Sara F[.], all whom were under 16, to engage in sexual intercourse or oral sex

with him." (Mar. 25, 2003, Trial Tr. at 368-69)(emphasis added). That is, Gravenhorst

selectively quotes the prosecutor's closing argument in advancing this argument that the

prosecutor made a fraudulent assertion of completed conduct.  (Am. Sec. 2255 Mem. at 25.)[11]

     Second, Gravenhorst believes that the prosecutor invited the jury to draw an improper

inference from the suggestion that Hedi K., a statutory adult, resembled a minor.  (Id. at 25.)   He

cites to the following portions of the prosecutor's closing statement:

> [Y]ou …know that the defendant knew that the girls were under 16 or was at least
> willfully blind to their age because they all told him that they were 14 or 15 years
> old.
>     And in fact, he also met with Hedi K[.] and was not deterred in any way,
> shape, or form by her age.  …

(Mar. 25, 2003, Trial Tr. at 269.)  Then in rebuttal, the prosecutor, Gravenhorst points out,

argued:

> I submit to you that any inconsistencies between Hedi K[.] and Robyn W[.] are
> not material to any issues you have.  Keep in mind that Hedi K[.] is only relevant
> to your analysis of Count 11.  Counts One through 10 deal with different girls
> who either received obscene images or who … the defendant had attempted to
> seduce.
>     Members of the jury, I submit to you that the defendant knew beyond any
> reasonable doubt their ages because they told him what their ages were.  And I
> think you can infer how he dealt with Hedi K[.] on January 23rd that he intended
> to do the same thing with all the other girls that he did with Hedi K[.].

(Id. at 292-93.)  He also cites to comments made by the Assistant United States Attorney at

sentencing asserting that it wanted a just punishment for the Hedi K. incident on a theory of

relevant conduct.  (Am. Sec. 2255 Mem. at 26-27.)   "The pejorative intent of the Government's

prosecution theory is clearly demonstrated in its attempt to imply unlawful intent to lawfully

---

[11]     He worries that the prosecutor's closing argument left "the jury to wonder what the actual crime was the defendant was attempting if, having engaged in no sexual conduct, he had, as the government alleged, nonetheless completed the crime."  (Id.)

allowable conduct, to mischaracterize Hedi K. as substantively indistinguishable from a minor, and to otherwise mislead the jury (as was the grand jury) on critical legal distinctions."  (Sec. 2255 Reply Mem. at 24.)

Gravenhorst repeats his complaint concerning the relevance of his marital and paternal status, this time asserting that his attorney should have objected to the prosecutor's reference to them in his closing argument: "And finally, you know from the testimony of the defendant's neighbor and his landlord that the defendant lived  at 16 Thompson in Concord, New Hampshire, with his wife and two children, and they never met anyone by the name of Andrew Graf or Justin Foxe."  (Mar. 25, 2003, Trial Tr. at 268.) (See also Sec. 2255 Reply Mem. at 24.)

Lastly on the topic of closing statements, Gravenhorst thinks his attorney should have objected to the  prosecution playing it both ways in arguing that Gravenhorst targeted girls he knew were 14, 15, and 16 which he knew because they told him or that he was willfully blind to their ages.  (Am. Sec. 2255 Mem. at 27; Mar. 25, 2005, Trial Tr. at 250, 256-57; Sec. 2255 Reply Mem. at 1, 24.)

These statements taken individually or cumulatively, although irritating to Gravenhorst, do not generate a showing of Strickland prejudice, even assuming the unlikely proposition that counsel performed inadequately in not objecting. See Olszewski v. Spencer, 466 F.3d 47, 61-62 (1st Cir. 2006).  Whether or not to object to representations in a closing argument is a prime example of a strategic choice per which counsel is due considerable deference.

21. **Failure to prepare rebuttal to Detective Todd Donnelly's testimony**

Gravenhorst again faults counsel for not contacting Private Investigator Scott Philbrick or Attorney James Gleason to rebut the testimony of Detective Todd Donnelly and, adds that he should have introduced a certified report by Philbrick --- which counsel had lost among his

42

papers in court – that would have refuted Donnelly's testimony that he had not outright denied

access to Hedi K.  (Am. Sec. 2255 Mem. at 28.)  Gravenhorst references his affidavit which

indicates as relevant:

> Attorney Ruffner was aware, from the very beginning, that NH-Licensed
> private investigator Scott W. Philbrick had attempted to interview Hedi K. on the
> Petitioner's behalf, but was unlawfully barred by Detective Todd Donnelly.  I
> spoke with Mr. Philbrick about his experience on the day in question and was
> further informed by him that agent Donnelly had contacted my then-counsel,
> James A. Gleason, and 'read him the riot act' for trying to interview "[his] victim
> (Hedi K.)," and that she was not to be interviewed.

(Gravenhorst Aff. at 4-5.)  Gravenhorst also attaches a copy of the Philbrick report.  This

report contains the following account by Philbrick of his visit to the house where Hedi

resided:

> The door was opened by a woman subsequently identified as **Anna**. …
> I introduced myself as **Scott Philbrick**, a private investigator from NH,
> and explained that I had been retained by **Charles Gravenhorst**, to investigate
> the accusations made against him.  I stated that I was interested in speaking with
> Hedi, and getting an accurate account of what happened.  I was invited in, and
> introduced to Hedi, who had been folding laundry on the living[]room floor.  I
> presented the woman with my card, and she invited me to sit down.
> She then called Hedi to the kitchen table, and  she (Hedi) sat down across
> from me,  I gave another card to Hedi, and again explained that I am a private
> investigator from NH, and that I was just trying to obtain some facts regarding
> this matter.  I further explained that I am not a police officer and that she was
> under no obligation to speak with me; that it was completely her choice.  She said
> that she understood, and sat down at the table with me.  She stated that she was
> willing to talk to me.
> Before I could begin however, the woman Anna, looked at my card and
> asked again who I worked for.  I explained a third time that I am a private
> investigator, and that I had been retained by Charles Gravenhorst.  Anna said that
> she was not sure it was "alright" for her to talk to me, and just wanted to run it by
> the police first.  I stated that it certainly was "alright" for her to talk with me, that
> it was completely her choice, and that the police should tell her exactly that. I
> agreed to wait while she called the police department. …The detective … spoke
> to Anna for approximately three to four minutes.  Anna then stated, "he doesn't
> want you talking to her."
> I asked to speak to the detective, and Anna handed me the phone.  At this
> time I spoke with **Detective Don[n]elly**.  I introduced myself to Detective

Don[n]elly, and explained my purpose for being at [Hedi's residence].  Detective Don[n]elly said, " I'm uncomfortable with you talking to *my* victim", adding something about her only being a kid and not needing to be further traumatized.

I stated that Hedi was right there at the moment, and that she was very willing, even eager to speak with me, and did not seem traumatized at the idea of speaking with me.  I explained to Detective Don[n]elly that I just wanted to talk to Hedi to obtain her version of the incident before too much time passed, as memory details tend to fade with time.  Detective Don[n]elly told me that she had already provided a statement to him, therefore her speaking to me was unnecessary.  I pointed out that in an interview, I might ask significantly different questions than he had asked, but he insisted.  He advised me that her statement would be provided in the discovery process, when the time comes.

I indicated that I would still like to conduct my own interview with Hedi, stating again that Hedi had indicated she was willing to talk to me.  Detective Don[n]elly then stated that he realized I was just trying to do my job, but that he was restricting me from talking to Hedi or Anna, and that that was not going to change.

(Philbrick Report at 1-3, Doc. No.23-5.)

Detective Todd Donnelly described his investigation at trial.  (Mar. 24, 2003, Tr. at 207-25.)  During cross-examination defense counsel did indicate that he misplaced something when he turned to questions about a phone called received by Donnelly from Hedi's aunt on March 28, 2002.  (Id. at 217-18.)   Donnelly was asked about receiving the call and talking to the private investigator who the aunt had indicated wanted to interview Hedi.  (Id. at 218.)  Donnelly testified that he did not tell the private investigator that he did not want him talking to Hedi.  (Id. at 218.) He then indicated that he did not remember his conversation with him but he did:

remember speaking with Hedi's aunt and explaining to her that while it wasn't my position to tell her not to speak with anybody, I did explain to her that it was my understanding that this individual was hired by the defendant's lawyer and that he was there to talk to her [in] reference [to] the case.  She could make her own conclusions about whether or not she wanted to speak with him.

(Id. at 219.)  Donnelly was then presented with Defendant's Exhibit 4 (which most likely is the report by Philbrick) which was used to refresh his memory.  (Id. at 219-20.):

44

> Q.      Do you now remember that conversation that we were discussing prior to my prior question?
> A.      Yes.
> Q.      The private investigator told you that he wanted to speak with Hedi K[.] to get her version of events.
> A.      Right.
> Q.      And in that, did you indicate that you would – that since Hedi's aunt was seeking your advice, you would  have to tell her, it would probably be best for them not to speak to the private investigator about the case?
> A.      Yes.

(Id. at 220.)  Defense counsel then asked questions that highlighted that by the time

Donnelly received the call from Hedi K.'s aunt he had received conflicting witness

accounts in the case as to what happened when Gravenhorst arrived at Hedi's residence.

(Id. at 221.)

> Q.      And when a representative of this defendant was trying to take a statement from Hedi [K.], you indicated that you were going to tell them it was not in their best interests for them to talk to the investigator?
> A.      I clearly told Ann Toresdahl, which is Hedi's aunt, that it was their decision, but she was asking my advice, and I told her that it probably would not be in her best interest to speak with him.
> Q.      And you told them that knowing at the time that there was some conflicting information as to – pardon me, as to what had taken place?
> A.      Yes.

(Id. at 222.)

> On re-direct the prosecutor proceeded:

> Q.      Detective Donnelly, at this point, when you're speaking to that private investigator, did you also tell him that you already documented the events and that that information would be given to him in discovery?
> A.      Yes, I did.
> Q.      And at that time you had this conversation with this private investigator, this was fairly soon after the events in question?
> A.      Yes, it was.
> Q.      Were you concerned about [Hedi K.'s] – what had transpired in her house that day?
> A.      Absolutely.
> Q.      And could you describe Ms. Toresdahl's, her aunt's mental state, was she agitated by this?

45

A.      Yes, she was very concerned.  In fact, I received the call at home, which is very unusual.  My dispatcher called me at home and stated she had Ann on the phone, and that in itself was unusual they would bother me at home over a phone call.  And Ann was adamant about seeking my advice because of what had taken place at her house.

Q.      And did she indicate to you whether or not this private investigator had been invited to her house or had simply shown up?

A.      Showed up out of the blue, she was very surprised at his arrival.

(Id. at 222-23.)

In his re-cross examination, defense counsel inquired:

Q.      [Y]ou interviewed her a couple of times between the 24th and the time of the private investigator was there, correct?

A.      Yes, that's correct.

Q.      And you were perfectly fine doing that; correct?

A.      Correct.

Q.      And so you're saying you didn't want her to be subjected to yet another interview?

A.      They asked me my opinion, and I gave it to them.

(Id. at 224.)

From the above it is evident that counsel was able to get the evidence in apropos Donnelly's efforts to prevent access to Hedi K.  Gravenhorst's efforts to make an ineffective assistance ground out of this is all smoke and no fire.

## 22. **Conflict of interest**

Moving on, Gravenhorst claims that his attorney had a conflict of interest in representing him illustrated by his "repeated displays of enmity toward his client, combined with his overt actions to undermine[] the composure of the Petitioner's wife preparing to testify."  (Am. Sec. 2255 Mem. at 28.)  "Counsel's disloyal and conflicted representation undermined effective advocacy at all stages of the proceedings, likely accounting for his 'fragmentary and disjointed defense,' lack of thorough preparation, and inattention to errors at trial." (Id.)

46

As best as I can discern the portions of Gravenhorst's affidavit that particularly relate to enmity towards Gravenhorst and unsettling the composure of his wife are as follows. Gravenhorst explains that he made arrangements to meet with Ruffner a month after his indictment because he lacked confidence in counsel's "competence and dedication." (Gravenhorst Aff. at 2.) Gravenhorst relates that he made a 5:30 p.m. appointment in Portland with Ruffner, necessitating that he leave work early and drive 200 miles, after Ruffner refused to meet him in New Hampshire.  (Id. at 2-3.)  Following the driving instructions provided by Ruffner's office, he got lost and arrived 15 to 20 minutes late and was greeted by a post-it note that declared, "'We waited. Had to go. Rob.'"  (Id. at 3.) Contacting the office the next day he was given no apology; he was only told, "'that was too bad.'"  (Id.) Gravenhorst continues:

> Such dismissive conduct was only a part of Ruffner's overall demeanor and performance.  I made many attempts to press Ruffner for information on the course of his research, investigation, and interviews with witnesses.  I was routinely countered with Ruffner's habitual admonition, "… well, if we go to trial; but we don't want to lose the opportunity for acceptance of responsibility if we can get an agreement from the government."  This despite my unwavering insistence, in light of the assessed sentencing risk, that, under no circumstances, would we be pursuing any other course but trial.
> …
> I was particularly disturbed, while awaiting release on bond, to have received information from inmates that  Ruffner did not like defendants accused of sex crimes because a member of his family had been assaulted (which question he evaded when directly pressed).

(Gravenhorst Aff. at 3-5.)

Gravenhorst  also indicates that Ruffner took no action when he was notified that there was a teenage girl who had overheard her friends "Hedi" and "Missy" brag "how they had 'gotten a guy thrown in jail for talking to them on the internet,' or words to that effect."  (Id. 5-6.) He continues:

My attempts to prod Ruffner to some substantial action led to conversation some months before trial, about trial prospects, where Ruffner stated directly, "Look, the jury is just not going to like you … they're not going to like you."  His tone and approach made me uncomfortable and suspicious.  I questioned him directly, "Rob, I'm talking about what the law says.  What are you saying?  Do <u>you</u> not like me?"  His response was, "That's not the point."  I came back, "What do you mean, 'that's not the point?' Are you saying you don't like me?"  Ruffner changed the subject.

(<u>Id.</u> at 6.)

After Gravenhorst was convicted he met with his attorney in the attorney's room.

Gravenhorst narrates the following: "and --knowing full-well the great part Christian faith played

with me and my family – his <u>first</u> words to me upon entering were, 'Well, I guess you[r] God

wanted you in jail.'"  (<u>Id.</u> at 9.)  Gravenhorst goes on:

I again learned from my wife of counsel's personal hostility towards me when, on June 5, 2003, at a conference with Mrs. Gravenhorst to review my sentencing prospects (Leda was doing her best to come up to speed on things), counsel twice expressed his antipathy toward me, stating to Leda, with our children present, "If I had been the father of those girls [the complainants],  I would have beaten him [me] up."  Later, as Leda related it to me over the phone that evening, Ruffner reiterated, "Even if I hadn't been the father, I would have killed him."

The absolutely most outrageous incident occurred the day just prior to sentencing, July 20, 2003, when Ruffner agreed to meet with Leda to receive an 'album' of commendation she had prepared – family events; community, music or church activities, etc. – and wished presented to the sentencing court.  My conviction and unexpected immediate detention had had a devastating emotional and financial impact on Leda and the family, having relied on me as sole provider to enable my wife to raise and home-educate our children full-time.  She had worked mightily following trial to pull the household and herself together and was committed to doing all she could to be of help to me at sentencing, and I was counting on her uniquely qualified testimony there on my behalf.

Leda devoted almost two months to compiling the 'album' of photographs and memories of our life together to present a positive, hopeful, and redeeming image to the court.  Meanwhile, I had been informed by counsel that the government sought an upward departure on the basis of events involving Hedi K, but also, notably, based on allegations of sexual advances toward a minor in South Carolina.

Because time had gotten too short to mail the material to the court, my wife arranged to meet Ruffner, who was coming to meet me, in the front of the

lobby of the county jail prior to his meeting with me.  When she arrived, at the last moment and somewhat hurried, with both our children in hand, she expressed her relief at being able to catch Ruffner in time to deliver the album to the court. As she related this experience to me over the phone the following day, she said, "I just want to make sure the court gets this so they can see what kind of man my husband really is."

At that moment, as Leda explained on the phone, Ruffner reached into his valise and pulled out the government's motion detailing the inflammatory allegations, handed it to my wife, who took a moment to gather the contents, and in the presence of both our children, blurted, "That's the kind of man your husband is."

Leda was devastated, as if Ruffner had punched her in the face.  She became immediately and understandably upset in the lobby and made her displeasure with Ruffner's inexcusable conduct abundantly clear.  When Ruffner came to meet with me, moments later, he mad[e] absolutely no mention of this incident, but was inexplicably cool to our previous intent that my wife testify on my behalf.  He simply stated he though[t] it best to keep it simple.  I acquiesced to his counsel, but insisted that Leda, nonetheless, not be denied her chance to make a statement.  I had been relying on the various letters of support as well as statements from my family (my sister, Dina, flew all the way out from California) to provide a basis for leniency at sentencing.  Leda's perspective was particularly valuable.  She knew me best.  I couldn't quite understand why Ruffner wouldn't also think her testimony essential.  I[t] was only later that I found out how he had completely undermined her composure with his thoughtless and duplicitous conduct.  When Leda related all this later, I was completely stunned.  The court's somewhat tough demeanor toward Leda when she spoke all became clear when I read the court's transcript of the discussion that went on prior to my arrival.  In an amazing repeat of his previous conduct, counsel enacted a pretense of innocence regarding Mrs. Gravenhorst, when in fact he was the cause of her discomposure.

(Id. at 9-11.)  In replying to the United States' pleadings in this matter, Gravenhorst has submitted an affidavit by Leda that supports some of his representations about her interactions with counsel, but not all.  (Doc. No. 50.)

At the pre-sentencing conference on the morning of sentencing Gravenhorst's attorney raised the issue of Leda's album and letter and her desire to address the court.  (July 21, 2003, Sentencing Tr. at 2-6.)   He explained that this material was not something he wished to include as part of his presentation to the court but that he felt obligated to provide a conduit for Leda's communication to the Court.  (Id. at 3.)  Counsel explained:

49

I would not be calling her to speak as a character reference due to her
state.  And … she may still wish to address the court, and it may still be proper in
the court's discretion to allow her to speak.  But … I will not be asking the court
formally to allow her to speak

….

[S]he's not testifying like a witness would testify in the sense that … I can't
examine her or cut off the examination.  I think if she speaks … she speaks, as
opposed to someone I would have some more control over. …

(<u>Id.</u> at 4-6.)  The Court summarized the situation:

Let's not mince words so the record is clear.  If I understand what you're
telling me between the lines is that both you and your client would prefer that she
not speak, but that if there's a public exhibition over it, you expect he will tell you
to let her go forward.

(<u>Id.</u> at 6.)

When she addressed the Court, Leda explained that she had homicidal thoughts after she

gave birth to her daughter and urged the Court to compare her victimless thought crime to that of

her husband's.  (<u>Id.</u> at 37-38.)  She opined:

Where … were the victims, if you will, in my case.  Was it my daughter,
Clair, who unknowing of my murderous thoughts throve under the gentle care of
my mothering.  Was it Chuck, whom I told of my thoughts.  No.
The only victim if you will was me who agonized under the weight of
these unmotherly thoughts that at the time were out of control.  Again, my
question to the court, can one be cast into prison because one's own thoughts are
hurting oneself.
Our own lawyer, Robert Ruffner and counsel told me that if she had been
his daughter, he would have beaten my husband up.
He then later in that time of talking about what had occurred said that even
if she had not been my daughter, he would have killed Chuck.
Should I now go forward and press charges against my lawyer, Robert
Ruffner, for having stated these murderous thoughts against my husband?  Would
the court prosecute such a case.  Common sense screams no, of course not.  This
would be absurd thinking.  How could it be rationalized among any reasonable
line of logic, recourse, reasonable line of law in American society.  Again, the
question arises where is the victim.
….
I would like to state to the court that because a more whole picture of who
my husband is from the letters of references, from his sister's statements, from my

50

letter, and these statements I am putting into the record right now is that these young ladies were not victims of my husband.

They are victims of society, a sick American society that is awash in a sea of sexual information that these girls through their curiosity are dipping into many wells and many seas, not just one sea.

And that this activity on their part has not stopped even though my husband is no longer involved , and that he did not enter into these lives as the first one, and they are not – he is not the last one.

(Id. at 37-39.)

At this juncture, the prosecutor objected, explaining:  "I don't think there's any facts in the record from which this statement can be made.  I think this diatribe is at your discretion, and at this point the government objects."  (Id. at 39.)  The defense had no answering objection.  The Court offered:  "Mrs. Gravenhorst, you're not helping your husband here today, perhaps that's your purpose, I don't know. …. He's here trying to take responsibility, you're here trying to shirk it off.  I think you should consider seriously your remarks."  (Id. at 40.)

Crediting Gravenhorst's  and Leda Gravenhorst's affidavit statements the court would have to assume that his trial attorney was judgmental about Gravenhorst because of his charged conduct.  Personal disapprobation on the part of counsel towards his or her client is not, standing alone, ineffective assistance.  Gravenhorst must demonstrate that this conflict adversely affected counsel's performance:

> To prevail on a claim of unconstitutional conflict, a defendant "who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler[v. Sullivan], 446 U.S. [335,] 348 [(1980)]. If a defendant proves that a conflict "actually affected the adequacy of his representation," he need not show prejudice to obtain relief. Cuyler, 446 U.S. at 349-50. Unless and until this threshold is met, however, a defendant "has not established the constitutional predicate for his claim of ineffective assistance." Id. at 350. In this Circuit, we have elaborated upon the Cuyler rule to require a defendant to show that (1) the attorney could have pursued a plausible alternative defense strategy and (2) the alternative trial tactic was inherently in conflict with or not pursued due to the attorney's other loyalties or interests. See Bucuvalas v. United States, 98 F.3d 652, 656 (1st Cir.1996).

51

Familia-Consoro v. United States, 160 F.3d 761, 764 (1st Cir. 1998); see also Reyes-Vejerano v.

United States, 276 F.3d 94, 97 -98 (1st Cir. 2002).

      The behavior that Gravenhorst identifies as counsel having made allegedly as a

consequence of his negative feelings about his client is conducting a fragmentary and disjointed

defense, failing to adequately prepare, and inattention to trial errors at trial.   These claims of

ineffective assistance have been addressed in separate grounds.  While Gravenhorst's

submissions may demonstrate that Ruffner's interaction with Gravenhorst's wife displayed some

disdain for her and for Gravenhorst, he has not shown a "conflict" that adversely affected his

lawyer's performance.

      23.  **General ineffectiveness and unprofessionalism**

      Gravenhorst's next volley against his trial attorney is a scattershot cumulative claim of

ineffective assistance.  He faults counsel for failing to inform the Court that Gravenhorst's

capacity was diminished; for poor preparation on his lack of specific intent argument; for not

pressing that there was no evidence that supported the completion of the crimes charged in

Counts 1 through 4 and no evidence that defendant was in reasonable proximity to allow for

commission of the crime; for not  presenting the argument that there is no real way to tell the age

of an email or chat room correspondent; for not highlighting that there was no evidence that he

ever solicited the individuals behind Counts 1 through 4 towards conduct at a particular time and

place; for not challenging the images and utterances identified as obscene by the government on

the grounds that they were insufficient to constitute obscenity as they were only a minute

fraction of the images or utterances taken as a whole; and for not arguing that solicitation alone

is insufficient to constitute significant conduct as required to qualify as a substantial step towards

the commission of a crime. (Am. Sec. 2255 Mem. at 28-30.)  Gravenhorst believes that it is

revealing that counsel's Rule 29 motion to acquit argument was more developed than the arguments made at trial.  (Id. at 30.)[12]

These arguments are redundant of Gravenhorst's other meritless ineffective assistance claims and stringing them together in this fashion does not entitle Gravenhorst to further collateral proceedings or to § 2255 relief.   Despite Gravenhorst's views to the contrary, this is not a criminal proceeding in which the prosecution's case was ephemeral or the jury took a long time to arrive at a verdict.  Compare Dugas v. Coplan, 428 F.3d 317, 335 -36 (1st Cir. 2005) ("The length of jury deliberations can be one factor in determining how close the jury viewed the case to be.  In a close case, the failure of defense counsel to present certain evidence or effectively challenge the state's evidence on important issues can be particularly prejudicial.").

### 24. **Failure to object to general verdict form**

Gravenhorst's final attack on counsel's performance at the trial stage is that he did not object to the general verdict form to specify the basis for any convictions on Counts 1 through 4. (Am. Sec. 2255 Mem. at 30.)  The verdict form was a straightforward sheet with the eleven counts listed and the not guilty and guilty options set forth.  It is not clear at all what Gravenhorst has in mind as to what the verdict form should have indicated.  My guess is that he thinks that there should have been some ability for the jury to indicate that it was finding him guilty of attempt rather than completed assignations with the four teens.  As already articulated, there is no merit to Gravenhorst's argument that there was some deficiency in the prosecution because it permitted the jury to convict him for mere attempt.

---

[12]     The contents of this motion are thoroughly addressed below in the discussion of Gravenhorst's final 28 U.S.C. § 2255 ground, which is not postured as an ineffective assistance of counsel claim.

**Sentencing Performance**

The United States takes a brevis, wholesale approach to Gravenhorst's ineffective

assistance claims pertaining to sentencing.  It reasons:

> At sentencing there was no dispute concerning guideline calculations, and Gravenhorst personally told the court that was his understanding (S. 17). However, Ruffner had raised sentencing issues that the Court described as "a matter of some intense debate and argument" (S. 25). If Gravenhorst waived sentencing issues, the Court told him that "they won't be subject to revisiting on appeal or a later collateral attack at a later time" (S. 27). The Court warned that Gravenhorst could "still attack [his] conviction on appeal or other matters, but not the [sentencing] issues we're talking about right now" (S. 27). Gravenhorst understood that he was giving up sentencing challenges. He was so confident in the decision that when the Court asked him if he needed to talk further with Ruffner, he replied, "No, I do not" (S. 27). In return for the waiver, the Government withdrew its motion for an upward departure from the Guideline range (S. 28).
>
> Clearly, all of Ruffner's sentencing decisions included Gravenhorst personally. Moreover, the decisions were made as a matter of sentencing strategy. Gravenhorst cannot show deficient performance. See Strickland, 466 U.S. at 687. Neither was there prejudice. Id. at 694. To the contrary, Ruffner's representation earned Gravenhorst the benefit of avoiding a possible upward departure. The sentencing claims fail.

(Gov't Resp. Mem. at 38-39.)

For its part, the First Circuit indicated:

> [W]e decline to consider Gravenhorst's claim that trial counsel was ineffective for waiving a sentencing argument. Infra at 5-6. As to this claim, there is insufficient factual development, and we therefore see no reason to deviate from our normal practice of requiring ineffective assistance of counsel claims to be pursued through a collateral proceeding under 18 U.S.C. § 2255. See United States v. Reyes, 352 F.3d 511, 517 (1st Cir.2003).

Gravenhorst, 2006 WL 1813906 at *1 n.1.

### 25.  Decision to waive challenge to sentencing range

In his first complaint about counsel's performance during sentencing Gravenhorst faults

counsel for advising him to waive a challenge to his sentencing range, agreeing to a Total

Offense Level of 29 rather than standing by an earlier argument that the offense level should be

25.  (Am. Sec. 2255 Mem. at 31.)   There was only a very slim advantage to this concession in

terms of Gravenhorst's guideline sentencing ranges, maintains Gravenhorst.  (<u>Id.</u> at 21-32 & n.

9.)   He explains:

> [T]he waiver, taken on erroneous advice of counsel, earned <u>no</u> benefit, but denied
> the defendant the opportunity to obtain one because, on the basis of the conditions
> of the waiver clearly set forth by the district judge … that he would entertain <u>no</u>
> argument from the government unless the defendant were successful, the
> Petitioner would have been exposed to no more detriment by objecting – the
> potential benefit of success being of greater, or no less, magnitude than potential
> detriment – but would be relinquishing appellate rights to great magnitude.

(Sec. 2255 Reply Mem. at 25.)   The question is, in Gravenhorst's view, "whether the district

court could have properly applied cross-section to U.S.S.G. § 2A3.2, as it did, to Group III

(Robyn W.) had counsel, but for his ineffectiveness, not advised Petitioner to waive this

challenge."  (Am. Sec. 2255 Mem. at 32.)   Gravenhorst believes that the PSI's characterization of

his encounter with Hedi K. as "'attempted statutory rape'" and the tie-in with his conduct with

Robyn W. was indefensible, and, thus, the application of the guideline would have been deemed

improper by this Court had the defense pressed the argument. (<u>Id.</u> at 32-34.)

    With regards to the ineffective assistance prejudice inquiry, this is the kind of claim that

this Court is uniquely capable of assessing given its extensive first-hand experience with the

travel of Gravenhorst's case from indictment through sentencing.  See <u>McGill</u>, 11 F.3d at 225.  In

terms of the first prong of Strickland, my assessment is that counsel made a strategic choice after

consulting with his client.  His performance was not deficient in that he identified the issues and

explained the risks.  Removing the risk of an upward departure motion being granted was

apparently significant to Gravenhorst at the time.

26.  **Failing to raise an _Apprendi v. New Jersey, 530 U.S. 466 (2000)_ objection**

Gravenhorst argues that counsel's failure to raise an objection under Apprendi v. New

Jersey, 530 U.S. 466 (2000) subjected him to "insurmountable 'plain error' review" on his direct

appeal.  (Am. Sec. 2255 Mem. at 35; see also Sec. 2255 Mem. at 25.)  Gravenhorst's appeal was

remanded for consideration in light of United States v. Booker, 543 U.S. 220 (2005). See

Gravenhorst v. United States, 544 U.S. 1029 (2005). The First Circuit reasoned:

> Gravenhorst was sentenced under the mandatory guideline regime which
> the Supreme Court declared unconstitutional in United States v. Booker, 543 U.S.
> 220 (2005). He acknowledges that he did not argue to the district court that the
> guidelines were unconstitutional. Therefore our review is for plain error. See
> United States v. Antonakopoulos, 399 F.3d 68, 80-82 (1st Cir.2005). Under this
> standard, a defendant must show "either in the existing record or by plausible
> proffer that there is a reasonable indication that the district judge might well have
> reached a different result under advisory guidelines." United States v. Jones, 432
> F.3d 34, 45 (1st Cir.2005) (internal citations omitted).
>
>  Gravenhorst does not present an argument that he would have presented
> additional facts to the district court, or that the court indicated that it would be
> inclined to impose a more lenient sentence if not bound by the guidelines. Rather,
> he contends that the case should be remanded for resentencing because the court
> committed a legal error in calculating the guidelines sentencing range by
> erroneously applying a cross-reference.
>
> We have recognized that a substantive error in the application of the
> guidelines will normally lead to a Booker remand.  See Antonakopoulos, 399 F.3d
> at 81. Here, however, Gravenhorst affirmatively waived the guidelines argument
> that he now seeks to make and stipulated to the sentencing range before the
> district court.  See United States v. Serrano-Beauvaix, 400 F.3d 50, 55 (1st
> Cir.2005) (declining to consider Booker remand argument based on claimed
> sentencing error, where the defendant waived the argument in his plea
> agreement). Moreover, Gravenhorst admits that, even if his sentencing argument
> were correct, the sentencing range would be unaffected. In these circumstances,
> we do not foresee any reasonable probability that Gravenhorst would receive a
> more lenient sentence on remand.

Gravenhorst, 2006 WL 1813906 at *3 (footnote omitted).

This <u>Apprendi</u>/<u>Booker</u> claim is now framed as an ineffective assistance claim.[13]  Just as the First Circuit could not perceive a reasonable probability that this Court would have settled on a more lenient sentence, I also cannot divine on the basis of Gravenhorst's argument here and on the existing records indications of a different outcome had the Court not been bound by the guidelines.  I also note that at the time of the criminal proceedings, First Circuit law was against an <u>Apprendi</u> argument so that there is no basis to conclude that counsel performed deficiently by not making this argument.  <u>See</u> <u>Campbell v. United States</u>, 108 Fed.Appx. 1, 2004 WL 1888604, *3 (1st Cir. Aug. 25, 2004) (quoting <u>United States v. Campbell</u>, 268 F.3d 1, 7, n. 7 (1st Cir.2001)); <u>see also</u> <u>Brooks v. United States</u>, Civ. No. 07-115-P-S, 2007 WL 4180540, 5  (D.Me. Nov. 19, 2007) (recommended decision), <u>aff'd</u>, 2007 WL 4287541 (D. Me. Dec. 5, 2007) ("Apropos the prejudice prong it appears just as the First Circuit concluded applying the <u>Antonakopoulos</u> 'reasonable probability' standard-that the 'outcome would [not] likely have been different' had counsel preserved the challenge and this case came back for re-sentencing in a <u>Booker</u>-framed proceeding. ...Under its plain error review the First Circuit concluded that this Court would not have changed Brooks's sentence had it remanded; of course, in the context of this 28 U.S.C. § 2255 proceeding, the sentencing judge is in the best position to determine whether or not the outcome would likely have been different if the Court reconsidered Brooks's sentence through the post <u>Booker</u> prism.") (citations and footnote omitted).

27. **Failure to alert the court to option of sentencing Gravenhorst to a fine alone**

In a similarly skeletal argument, Gravenhorst faults counsel for not presenting to the court the possibility that it could sentence Gravenhorst to the option of imposing only a fine per

---

[13]   The First Circuit noted: "Gravenhorst also argues that his trial counsel provided ineffective assistance of counsel by waiving his sentencing argument." <u>Id.</u> at 3 n.4.

the "federal statutes in force, at the time of the offenses charged," rather than a term of imprisonment.  (Am. Sec. 2255 Mem. at 35.)  Gravenhorst does not address this issue in his reply memorandum.  It is patently without merit.

28. **Failure to argue that the sentence on Count 11 exceeded the Guidelines**

Gravenhorst, while recognizing that his sentence on other counts moots the importance of the issue, argues that counsel neglected to point out that his Total Offense Range on Count 11 of 24-30 months should have been 12.  (Am. Sec. 2255 Mem. at 35.)  He opines: "It is likely the court's perspective on the Petitioner's overall culpability would have been different if alerted to this matter.  (Id.)  Gravenhorst does not address this issue in his reply memorandum.  As conceded by Gravenhorst, this ground also has no prospect of entitling him to 28 U.S.C. § 2255 relief.

29. **Failure to object to Government misconduct**

Gravenhorst resurrects his complaint concerning the prosecution's reliance on uncharged conduct vis-à-vis Hedi K., this time relating the claim to sentencing.  (Am. Sec. 2255 Mem. at 36.)  Gravenhorst believes that it was not permissible for the prosecution to successfully argue at trial that proof of the criminal offense required only an attempt of statutory rape and then at sentencing to argue successfully that all that was needed to hold his conduct against him was proof of attempted statutory rape.  (Sec. 2255 Reply Mem. at 1.)   He also complains:

> At trial, and on appeal, [the Government argued], over defense objection, the relevance of Hedi K.'s testimony on Counts 1-4, prevailing on its unlimited admission, and then arguing to the jury in closing, after being undermined by refuting testimony supplied by its own witness, Robyn W., that Hedi K.'s testimony was only relevant to Count 11. …[And at] trial, and on appeal, arguing, over defense objection, that all the evidence presented in Hedi K.'s testimony – including allegations of unlawful conduct by the accused – was relevant and necessary to convict, but now arguing that evidence of such allegations, "even if false," was not relevant. …

>When two theories, **A** and **B**, are mutually repugnant, prosecutors may argue either A <u>or</u> B, but may not argue both A <u>and</u> B….
>
>The Government, in the instant case, has repeatedly employed this tactic and attempts to do so here again.  The Government may not prevail on claims that testimony of Hedi K. is both relevant to the charges and irrelevant to the matter of its being perjury.  The Government may not have it both ways.

(<u>Id.</u> at 2-3.)  Gravenhorst does not address this issue in his reply memorandum.  With regards to the United States' use of the Hedi K. evidence, it was entirely appropriate to present the argument to the Court, and counsel, who was seeking to avoid an upward departure and hoping for leniency from the Court on the basis of Gravenhorst's contrition, acted well within the range of <u>Strickland</u> competence in refraining from pressing such an argument.

### 30.  **Failure to argue that conduct was out of the heartland of a guideline**

Gravenhorst further believes that his sentencing attorney should have argued that Gravenhorst's conduct did not fall within the ambit of U.S.S.G. § 243.2 which "properly 'focuses on those individuals who **travel** to meet or transport minors.'" (Am. Sec. 2255 Mem. at 36.)  He maintains that he "never met any 'minor,' pursuant to the charges, nor did he attempt, arrange, or agree to."  (<u>Id.</u>)  Gravenhorst does not address this issue in his reply memorandum.  Once again, this argument arises from Gravenhorst's insistence that he should not be held accountable for his attempts to meet with the underage complainants because he never sufficiently firmed up a time and place to fulfill his aspirations.  I have already concluded that this attack has no merit with regards to counsel's pre-trial and trial performance, and the same definitely holds for performance during sentencing.

### 31.  **Disloyalty and conflict of interest**

In this challenge to his attorney's performance at sentencing, Gravenhorst cites to his attorney's interactions with his wife described in Number 22.  (Am. Sec. 2255 Mem. at 36-37.)

Gravenhorst does not address this sentencing issue in his reply memorandum.   It has no more merit than it did with respect to the conflict of interest ground discussed at some length earlier.

### 32. **Failure to present mitigating evidence**

In his thirty-second discontent with counsel's conduct Gravenhorst faults his attorney for not presenting data from the United States Department of Justice showing that similarly-situated offenders posed relatively low risk of recidivism.  (Am. Sec. 2255  Mem. at 37.)  He expresses the view that this Court articulated a belief that offenders of his ilk were unlikely to rehabilitate. (Id.) Gravenhorst does not address this ground in his reply memorandum.  Gravenhorst has not included even a summary of the data he thinks counsel should have introduced and this ground is far too skeletal to deserve further discussion.

### 33. **Failure to argue on the benefit of family to the community**

Gravenhorst's last complaint with counsel apropos sentencing is that his "strong, close family was a mitigating factor at sentencing that counsel never argued, despite Petitioner's request, and which counsel sought to actively undermine with his disloyal conduct." (Am. Sec. 2255 Mem. at 37.)  Gravenhorst does not address this issue in his reply memorandum.

It is clear from the sentencing transcript that this Court was well aware of Gravenhorst's family, as the children arrived for sentencing[14] and Gravenhorst's wife made the above cited appeal to the Court during sentencing.  Counsel articulated his concerns to the Court apropos Leda Gravenhorst's desire to make a presentation to the Court and walked a tightrope in facing the expectations of his client and Leda Gravenhorst's while cultivating the tolerance of the Assistant United States Attorney and this Court to the unconventional situations.  More

---

[14]        The Court wisely encouraged Mrs. Gravenhorst to make arrangements for the children during the portion of the proceedings in which the conduct of their father would be discussed.

important in terms of this claim, Gravenhorst has not described how his family situation

benefited the community in such a way (in comparison to other similarly situated defendants

with families) that it would have warranted the imposition of a lesser sentence in Gravenhorst's

case.

### Challenge to the representation of appellate counsel

Gravenhorst has a three-pronged[15] attack on the decisions made by his appellate counsel

in framing his direct appeal.  In general he faults his attorney's "abandonment of preserved and

stronger claims in favor of his one weak argument on appeal…. necessitating the filing of

[Gravenhorst's] inartful Pro Se Supplemental brief, and later submission after remand under

heightened review."  (Am.Sec. 2255 Mem. at 43.) With regards to these arguments the First

Circuit stated:

> Gravenhorst raises several claims by way of a pro se brief which we do
> not discuss in the text. We have fully considered these claims and summarily
> reject them because the arguments are either underdeveloped or are not worthy of
> extended appellate discussion. See United States v. Fazal-Ur-Raheman-Fazal, 355
> F.3d 40, 44 n. 2 (1st Cir.2004).

Gravenhorst, 377 F.3d at 51 n.1. And then, after remand, the First Circuit revisited the question

in Gravenhorst's pro se submission:

> In May 2005, the Supreme Court vacated this court's judgment and
> remanded the case "for further consideration in light of United States v. Booker."
> Gravenhorst v. United States, 544 U.S. 1029 (2005). We subsequently ordered
> supplemental briefing. We also permitted Gravenhorst to file a counseled,
> oversized brief as well as a pro se brief. In these briefs, Gravenhorst raised several
> challenges to his convictions and sentence that are beyond the scope of the
> Supreme Court's remand order. While not required to address these issues, we
> may do so in our discretion. See United States v. Estevez, 419 F.3d 77, 82 (1st
> Cir.2005). Despite the fact that some of these arguments were previously waived

---

[15]     In his supplemental affidavit Gravenhorst maintains that his appellate counsel admitted to him on the
telephone that he failed to verify the record on appeal and that he "blew it."  (Supp. Gravenhorst Aff. at 2)  He also
complains that his appellate counsel informed him that any ineffective assistance claim against him would prevent
the involvement of any Federal Defender in subsequent proceedings.  (Id.)

by not being timely raised on appeal, given that we have complete briefing, we exercise the discretion to consider most of these newly argued issues, although we ultimately conclude that they are without merit and that Gravenhorst is not entitled to resentencing under <u>Booker</u>.

<u>Gravenhorst</u>, 2006 WL 1813906 at *1(footnote omitted).

In his first particular attack on appellate counsel's performance Gravenhorst asserts that he should have argued that this Court "abused its discretion in failing to limit the testimony of Hedi K., or to exclude certain evidence of certain names to alleged sexually-oriented websites." (Am. Sec. 2255 Mem. at 43-44.)  Reiterating points made in his earlier grounds apropos the Heidi K. testimony, the Court's admission of the testimony, and counsel's failure to assure a limiting instruction (<u>id.</u> at 44-47), Gravenhorst does add that this Court "failed to appreciate the gravity of the testimony and took too lightly its potential for harmful prejudice."  (<u>Id.</u> at 45 n.6.) As discussed at some length earlier with regards to ground Number 16, the First Circuit addressed Gravenhorst's challenge to the admission of Hedi K.'s testimony at some length in its second appellate opinion and definitively concluded that there was no abuse of discretion, <u>see</u> <u>Gravenhorst</u>, 2006 WL 1813906 at *2.  Obviously Gravenhorst cannot now succeed with an ineffective assistance claim against appellate counsel as to this issue.

Gravenhorst's second complaint about appellate performance relates to the Court's willful blindness instruction.  (<u>Id.</u> at 47.)  He maintains that the Government presented no evidence that he was deliberately ignorant of the ages of the girls.  (<u>Id.</u>)  Gravenhorst raised this claim in his <u>pro</u> <u>se</u> brief to the First Circuit.  (<u>See</u> Doc. 28-2 at 5, 11, 17-18.)  The First Circuit rebuffed this claim indicating that it had considered its merits, <u>see</u> <u>Gravenhorst</u>, 377 F.3d  at 51n. 1, and, therefore, the failure of appellate counsel to raise a meritless claim does not generate a showing of <u>Strickland</u> performance deficiency or prejudice.

Finally, Gravenhorst faults his appellate counsel for not arguing that the Government presented insufficient evidence to support his convictions on any of the eleven counts.  (Id. at 47.)  He focuses most attention on Counts 1 through 4.  He feels as though the Government "failed to establish any conduct sufficient to constitute a 'substantial step' toward commission of the target offense, or that the accused possessed with requisite 'knowledge' sufficient for criminal culpability – in the absence of any completed sexual conduct, attempt being the only basis for conviction."  (Id. at 48.) He summarizes:

> The government never specified, nor did the Indictment or any Bill of Particulars articulate, what conduct of the Petitioner crossed from innocent to criminal conduct:  a "substantial step."  First, no conduct committed towards Hedi K. could rationally serve to constitute criminal conduct toward another (nor could any conduct, lawful with Hedi K., constitute intent toward another with whom it would be unlawful); second, sexually explicit images, whatever speculative intent they may evince, cannot themselves constitute that overt act sufficient to attempt; and third, solicitations with no reference to conduct at a particular time and a particular place, cannot suffice to form an attempt.

(Id.)  The 'particular place,' Gravenhorst argues, would have had to be in Maine in order for his conduct to amount to statutory rape under Maine law.  (Id. at 49-50.)  With regards to Gravenhorst's absence-of-substantial-step argument, on remand the First Circuit explained:

> Conviction for a violation of 18 U.S.C. § 2422(b) requires the government to show that the defendant attempted to (1) use a facility of interstate commerce (2) to knowingly persuade, induce, entice, or coerce (3) an individual under the age of 18(4) to engage in illegal sexual activity. See United States v. Munro, 394 F.3d 865, 869 (10th Cir.2005). Gravenhorst argues that the government did not present sufficient evidence from which a jury could conclude that he took a substantial step toward committing a § 2422(b) violation. He preserved this argument below, and therefore we review it de novo, after analyzing the evidence in the light most favorable to the verdict. United States v. Byrne, 435 F.3d 16, 22 (1st Cir.2006).
>
> To prove attempt, the government must establish both an intent to commit the substantive offense and a substantial step toward its commission. See United States v. Burgos,254 F.3d 8, 12 (1st Cir.2001). A substantial step is something more than preparation but something less than the last act necessary to commit the crime itself. See United States v. LiCausi, 167 F.3d 36, 47 (1st Cir.1999). "[O]ur

caselaw shows, [however], that the defendant does not have to get very far along the line toward ultimate commission of the object crime in order to commit the attempt offense." See United States v. Doyon, 194 F.3d 207, 211 (1st Cir.1999).

        The evidence establishes that Gravenhorst sent each young woman a sexually explicit message and asked each to meet him to engage in sexual activity. If anyone had agreed to Gravenhorst's proposition, all that remained was working out the details of where and when to meet. "The main purpose of the substantial step requirement is to distinguish between those who express criminal aims without doing much to act on them and others who have proved themselves dangerous by taking a substantial step down a path of conduct reasonably calculated to end in the substantive offense." Id. (internal citation omitted). A jury could reasonably conclude that, once Gravenhorst moved from sending email messages referring generally to sexual matters to asking young women to meet him to engage in sexual activity, he engaged in a substantial step toward inducing the women to engage in illegal sexual conduct.

Gravenhorst, 2006 WL 1813906, at *1 (footnotes omitted).  Not much needs be said on this score; the First Circuit provided a thorough de novo review of this claim that was raised on direct appeal.  Nothing in Gravenhorst's 28 U.S.C. § 2255 pleadings suggests an argument that counsel might have raised on direct appeal that would have persuaded the First Circuit that this challenge had any merit.

**C.**        **Direct challenges to his conviction**

        Gravenhorst also lodges a direct challenge to his convictions on Counts 5 through 11, arguing that the United States did not prove all elements of his offense beyond a reasonable doubt.  (Am. Sec. 2255 Mem. at 37-38.)  He explains, the images charged in Counts 1-11 cannot be found to appeal to anything other than a "normal healthy interest in sex and sexually-related concerns." Gravenhorst also argues that "no evidence of appeal to any prurient interest was presented. None of the complainants testified to any perverse, morbid, or unhealthy interests provoked by the materials."  (Id. at 39.)  "Thus," Gravenhorst maintains, "unless this court holds that pictures of heterosexual intercourse and the male genitals are 'shameful and morbid' in their appeal, neither those images, nor the Instant Messages, charged can be deemed obscene."  (Id.)

64

Gravenhorst also believes that because the charge materials were only a small portion of his overall communications, his communications "taken as a whole" did not appeal to prurient interests in sex.  (Id. at 40.)  He further maintains that if a national standard of decency were applied to his case then the materials charged would not have been deemed obscene.  (Id. at 40-41.)   In his fifth direct challenge to his conviction Gravenhorst contends that Government Exhibit 52 was not patently offensive because it did not show masturbation or a lewd display of the genitals.  (Id. at 41.)  He thinks that the Government's assertion that the male portrayed in the image was engaged in masturbation or other sexual activity was purely speculative.  (Id.)  Gravenhorst goes on to maintain that the Government did not prove that he knew that the Count 5 through 10 complainants were under the age of 16.  (Id.)  He indicates that he never met any of these individuals and that the only contact he had with them was through electronic means. (Id. at 42.)  Gravenhorst's final direct assault on his conviction pertains to Count 11;  he argues that the utterances there charged were not "hard core" enough to warrant conviction on that count. (Id. at 43.)

In Berthoff v. United States the First Circuit explained in the context of 28 U.S.C. § 2255 review:

> "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Reed v. Farley, 512 U.S. 339, 354 (1994) (internal citation omitted). The principles of finality, federalism, and comity inform the scope of habeas review. Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir.2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 633-35(1993); Teague v. Lane, 489 U.S. 288, 308-10 (1989)). Accordingly, a defendant's failure to raise a claim in a timely manner at trial or on appeal constitutes a procedural default that bars collateral review, unless the defendant can demonstrate cause for the failure and prejudice or actual innocence. Bousley v. United States, 523 U.S. 614, 622 (1998).

308 F.3d 124, 127 -28 (1st Cir.2002).  Gravenhorst had two full opportunities to raise these claims in his direct appeals.

I add the following. In addressing Gravenhorst's claims in his second appeal, the First

Circuit explained in a footnote:

> We decline, however, to exercise discretionary authority to consider
> Gravenhorst's argument that the obscenity convictions must be overturned on the
> ground that the images are not obscene as a matter of law. The record for this
> claim is incomplete as the images are not before us, and we are therefore without
> adequate information to rule at this time.

Gravenhorst, 2006 WL 1813906 at  *1 n.1.  Gravenhorst did not properly present this challenge

to the First Circuit in his direct appeal and he cannot now revive it as a collateral challenge.

What is more, he has not developed a case for this claim in this collateral challenge beyond his

argument.

It is also of some significance that this Court did have all the evidence at its disposal during

the trial and it denied Gravenhorst's Federal Rule of Criminal Procedure Rule 29 motion which

was premised in part on an argument that the pictures underlying the convictions on Counts 5

through 11 were not obscene. (Mot. Acquittal at 1, Crim. No. 02-79-P-H, Docket No. 30.)  He

also argued that "as to Count Eleven the specifically alleged 'obscene' language is not obscene."

(Id.)

In his memorandum, counsel argued:

> In Counts five through eleven the Government … failed to produce
> evidence by which a reasonable juror could find beyond a reasonable doubt that
> the materials transferred were "obscene".  To be obscene the materials must  "[1]
> appeal to the prurient interest in sex, … [2] portray sexual conduct in a patently
> offensive way, and [3] which, taken as a whole, do not have serious literary,
> artistic, political or scientific value." Miller v. California, 413 U.S. 15, 24 (1973).
> The material in question must meet all three prongs of the "Miller" to be obscene.
> Id. The first two prongs of the Miller test is applied through the lens of the
> "average person, applying contemporary community standards". Id.  The third
> prong is met by applying the prong through the eyes of a "reasonable person in
> any given community". Pope v. Illinois, 481 U.S. 494, 500 -01 (1981).
> The material in Counts Five, Seven and Nine do not meet the Miller test
> because they do not depict "sexual conduct".  Counts Five, Seven[,]Nine and

66

Eleven relate to an image with the filename "justinHard4U". "justinHard4U" depicts a clothed male from the torso to the knees with an erect penis protruding from his pants. While an erect penis may be a sign of sexual stimulation, it is not, in and of itself, sexual conduct. Even if the Court finds "justinHard4U" is sexual conduct it is not a patently offensive depiction of sexual conduct nor does it appeal to the prurient interest in sex. ....

Counts Six, Eight, Ten and Eleven all relate to an image with the filename "aaronanderica". The Government failed to produce evidence by which a reasonable juror could find that "aaronanderica" meets the Miller test for obscenity. In particular the Government failed to prove that "aaronanderica" portrays sexual conduct in a patently offensive way or appeals to prurient interest in sex. "aaronanderica" depicts a male and female engaged in intercourse in what could be described as straight sex.

On the issue of obscenity the Government failed to present any evidence other than the images themselves. The Government failed to present evidence as to why these materials were patently offensive or appealed to the prurient interest in sex. In its review of the two photographs the Court should be mindful that who these images were sent to and defendant's other conduct is irrelevant to the determination of whether the images are themselves obscene.

Allowing this verdict to stand would set the bar for obscenity far too low. For example, it would be a violation of the law for woman depicted in "aaronanderica" to email, or to mail for that matter, the image "aaronanderica" to the male depicted in that image. This would be a considerable restriction on an individual's right to expression.

The Supreme Court as well as the First Circuit, has held in the past that images of female genitalia are not obscene. Central Magazine Sales, Ltd. V. United States, 88 S. Ct. 235 (1967), Hunt v. Keriakos, 428 F.2d 606(1st Cir. 1970). Although these cases were before the Miller decision they are still instructive here. In Hunt, the First Circuit held that "no photograph of the female anatomy, **no matter how posed** if no sexual activity is engaged in, **or however lacking in social value**, can be held obscene." Hunt, at 608 (emphasis added). In Hunt the material was described as follows:

> In all instances the pictures consist of photographs, many in full color, of young women either largely or totally undressed, exposing various portions of their bodies, but generally focussing on the vulva. In some instances stockings, garter belts, or other apparel are used to increase this emphasis, and in many instances positions, even to the point of contortion, are assumed so that no detail will be lost. Id. at 607.

This analysis must apply equally to male genitalia.

The fact that the First Circuit has found similar images not to be obscene should control the Court's decision here. In Hunt, the First Circuit noted that if they were to find that materials were obscene when the Supreme Court had already ruled that similar material were not "would render the question of obscenity vel non even more amorphous than any test previously suggested." Id.

(Mem. Mot. Acquittal at 2-4, Crim. No. 02-79-P-H, Docket Nos. 30 & 31.)

I cannot identify a reason on this record for this Court to revisit its earlier Rule 29 conclusion. McGill, 11 F.3d at 225.[16]

## D.       Motions for Appointment of Counsel and For Reconsideration on Hearing

Having painstakingly addressed each of Gravenhorst's 28 U.S.C. § 2255 grounds above, replete with his affidavit statements pertaining to his interactions with his attorney, I conclude that his § 2255 grounds, while many and varied, do not require further scrutiny.  Based on this conclusion, I deny Gravenhorst's motion for appointment of counsel and his motion for reconsideration of the denial of his request for a hearing (Doc. Nos. 43 & 44).[17]

### Conclusion

For the reasons set forth above I recommend that the Court deny Gravenhorst 28 U.S.C. § 2255 relief.  Because I conclude that is motion is subject to summary dismissal, I deny Gravenhorst's motion for a hearing and his motion for appointment of counsel. I further recommend that no certificate of appealability should issue in the event Gravenhorst files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served

---

[16]      I note that Gravenhorst did not expressly challenge appellate counsel for failing to fully develop his argument on this score.  However, even if such a challenge was part of the complexion of this case, it would still be for this Court to gauge the likely merits of the argument on appeal had appellate counsel pressed it more assiduously.  The Court has already rejected the well articulated arguments of trial counsel.

[17]      It goes without saying that if the Court disagrees with my recommendation on the merits of Gravenhorst's 28 U.S.C. § 2255 motion then my orders on these two motion in no way foreclose appointment of counsel or the convening of a hearing.

with a copy thereof.  A responsive memorandum shall be filed without ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Date:  August 28, 2008

69